No. 15-5150

# United States Court of Appeals
# for the Federal Circuit

◆

THALES VISIONIX, INC.

*Plaintiff-Appellant,*

v.

UNITED STATES

*Defendant-Appellee,*

and

ELBIT SYSTEMS OF AMERICA, LLC,

*Third Party Defendant-Appellee.*

◆

Appeal from the United States Court of Federal Claims
in Case No. 1:14-cv-00513-TCS, Judge Thomas C. Wheeler

## CORRECTED PRINCIPAL BRIEF FOR PLAINTIFF-APPELLANT
## THALES VISIONIX, INC.

Meredith Martin Addy
  *(Principal Counsel)*
Michael A. Dorfman
Martin S. Masar III
KATTEN MUCHIN ROSENMAN LLP
525 W Monroe St
Chicago, IL 60661
(312) 902-5200
(312) 902-1061 (facsimile)
meredith.addy@kattenlaw.com

Christopher B. Ferenc
KATTEN MUCHIN ROSENMAN LLP
2900 K Street NW
Washington, DC 20007
(202) 625-3500
christopher.ferenc@kattenlaw.com

*Attorneys for Plaintiff-Appellant, Thales Visionix, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Appellant Thales Visionix, Inc. certifies the following:

1.   The full name of every party or amicus represented by me is:

    Thales Visionix, Inc.

2.   The name of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me are:

    Not applicable.

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    Thales Visionix, Inc. (TVI) is a wholly-owned subsidiary of Thales Defense & Security, Inc. (TDSI), formerly Thales Communications, Inc. (TCI). TVI stock is 100% held by TDSI, formerly TCI. TDSI is owned by Thales Holding Corporation, a subsidiary of Thales USA, Inc. Thales, USA, Inc. is a subsidiary of Thales S.A., which is publicly traded on the Euronext Paris.

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by this firm in the trial court or agency or are expected to appear in this court are:

    Anthony W. Shaw, Craig S. King, Aziz Burgy, Taniel E. Anderson, Ahmed Abdel-Rahman, Brian J. Stevens of Arent Fox LLP

    Meredith Martin Addy, Michael A. Dorfman, Martin S. Masar III and Christopher B. Ferenc of Katten Muchin Rosenman LLP.


Dated:  March 2, 2016                    By: /s/ Christopher B. Ferenc

i

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ...........................................................................i

STATEMENT OF RELATED CASES ...............................................................1

JURISDICTIONAL STATEMENT ...................................................................1

ISSUES PRESENTED.........................................................................................2

STATEMENT OF THE CASE............................................................................4

STATEMENT OF FACTS ...................................................................................5

I.   Inertial Sensors for Tracking Relative Motion............................................5

    A.   Background Principles of Inertial Motion Tracking..........................5

    B.   Traditional Inertial Motion Tracking Systems Had Several
        Drawbacks When Tracking Small Objects .........................................9

II.  The '159 Patent Claims The Transformation of Raw Data From
    Inertial Sensors Into Accurate Relative Object Pose..................................12

    A.   InterSense, Inc. and Eric Foxlin.......................................................12

    B.   Foxlin's Claimed Invention...............................................................13

    C.   The Patented System Uses Raw Inertial Sensor Readings
        To Accurately Determine Orientation And Position ........................17

    D.   The Patented System May Be Located Entirely Onboard
        The System And Does Not Need Ground-Based
        Coordinate Data.................................................................................20

III. Proceedings Before The Court of Federal Claims......................................21

    A.   Hearing On Defendants' Motion For Judgment On The
        Pleadings ...........................................................................................22

    B.   CFC Decision Dismissing TVI's Case..............................................26

        1.   Application of *Alice* ...............................................................26

        2.   Application of Prior Supreme Court Precedent......................27

        3.   Machine-or-Transformation Test............................................28

IV.  Co-pending Proceedings Before The Patent Trial And Appeal
    Board...........................................................................................................30

V.    The Claims At Issue On Appeal ..................................................................31

SUMMARY OF ARGUMENT ...........................................................................35

STANDARD OF REVIEW .................................................................................39

ARGUMENT .........................................................................................................39

I.    The Court May Rule That The Asserted Claims Are Patent
       Eligible ..........................................................................................................39

II.   Under *Alice*, None Of The Asserted Claims Are Unpatentably
       Abstract ..........................................................................................................40

       A.    Step One:  The Claims Are Not "Directed To" A Law of
              Nature Or An Abstract Idea ...............................................................41

              1.    The Claims Require A Specific Structural
                     Combination With Appropriate Functional
                     Language ..................................................................................42

              2.    The Functional Language Does Not Improperly
                     Cover A Law of Nature or An Abstract Idea ..........................43

       B.    Step Two:  The Claims Recite A Patent-Eligible
              Application Of An Idea ......................................................................46

              1.    The Claimed Inertial Sensors Limit The Scope To
                     A Patent Eligible Navigation Invention ..................................48

              2.    The Claims Solve Known Error Problems When
                     Tracking A Moving Object, Such As A Head, From
                     A Moving Platform, Such As An Aircraft ...............................54

III.  The CFC Legally Erred In Holding That The Claims Preempt
       The "Idea" of Motion Tracking ....................................................................56

IV.   The CFC Legally Erred In Holding That The Asserted Claims
       Failed To Satisfy The Machine-or-Transformation Test ............................57

       A.    The System Claims Cover A Machine, Not Appropriate
              For Application Of The Machine-Or-Transformation Test .............58

       B.    The Methods Claims Satisfy Step One Of The Machine-
              Or-Transformation Test .....................................................................59

              1.    Claims 22-26 and 41 Require The Particular
                     Combination Of Limitations To Non-
                     Conventionally Calculate Relative Orientation .....................60

2.    Claims 33 and 34 Require The Particular
      Combination Of Limitations To Non-
      Conventionally Calculate Relative Position ........................... 62

C.   The Method Claims Satisfy Step Two, Transforming Raw
     Data From Inertial Sensors Into Accurate Pose
     Information .......................................................................... 63

V.   The Court of Federal Claims Legally Erred By Failing To
     Consider The Asserted Dependent Claims ................................... 64

CONCLUSION ..................................................................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. V. CLS Bank Int'l*,
    134 S.Ct. 2347 (2014).............................................................. *passim*

*Bilski v. Kappos*,
    561 U.S. 593 (2010)............................................................... *passim*

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) .....................................................39

*California Inst. of Tech. v. Hughes Commc'ns Inc.*,
    59 F. Supp. 3d 974 (C.D. Cal. 2014) ............................................46

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014) .............................................42, 49

*Diamond v. Diehr*,
    450 U.S. 175 (1981)............................................................... *passim*

*Gottschalk v. Benson*,
    409 U.S. 63 (1972)...................................................................46, 58

*In re Comiskey*,
    554 F.3d 967 (Fed. Cir. 2009) .....................................................39

*In re Schreiber*,
    128 F.3d 1473 (Fed. Cir. 1997) ...................................................43

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015) ...................................................45

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)......................................................................49

*Lexington Luminance LLC v. Amazon.com Inc.*,
    601 F. App'x 963 (Fed. Cir. 2015)..............................................40

*Mayo Collaborative Servs. v. Prometheus Labs. Inc.*,
  132 S.Ct. 1289 (2012).............................................................................. *passim*

*Parker v. Flook*,
  437 U.S. 584 (1978)...........................................................................28, 46, 59

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
  264 F.3d 1344 (Fed. Cir. 2001) ......................................................65

*Schumer v. Lab. Computer Sys., Inc.*,
  308 F.3d 1304 (Fed. Cir. 2002) ......................................................65

*SiRF Technology, Inc. v. International Trade Com'n*,
  601 F.3d 1319 (Fed. Cir. 2010) ......................................................63

*United States v. Adams*,
  383 U.S. 39 (1966)............................................................................50

## Statutes

35 U.S.C. § 101 ....................................................................................38, 41, 52

35 U.S.C. § 102(a) ...............................................................................50

35 U.S.C. § 282......................................................................................65

## Other Authorities

Manual of Patent Examining Procedure § 2173.05(g)
  (9th ed. Mar. 2014) ....................................................................43, 52

# TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| **'159 Patent** | U.S. Patent No. 6,474,159 |
| **6DOF** | six degrees of freedom |
| **A___** | joint appendix page ___ |
| **CFC** | United States Court of Federal Claims |
| **Elbit** | appellee Elbit Systems of America, LLC |
| **F-35** | Lockheed Martin F-35 Joint Strike Fighter |
| **HMDS** | helmet-mounted display system |
| **IMU** | inertial measurement unit |
| **Michel Amicus Brief** | Amicus brief of The Honorable Paul R. Michel Supporting Neither Party |
| **MOT** | the "machine-or-transformation" test |
| **n-frame** | navigation reference frame |
| **PTAB** | United States Patent and Trademark Office Patent Trial and Appeal Board |
| **TVI** | appellant Thales Visionix, Inc. |
| **U.S.** | appellee United States |
| ***x:y-z*** | column $x$, lines $y$ to $z$ of patent or transcript cited |
| **MPEP** | Manual of Patent Examining Procedure |

## STATEMENT OF RELATED CASES

Trial for the following *inter partes* review was instituted by the United States Patent and Trademark Office Patent Trial and Appeal Board (PTAB): *Elbit Systems of America, LLC v. Thales Visionix, Inc.*, IPR2015-01095, Paper 10 (Oct. 26, 2015).

## JURISDICTIONAL STATEMENT

This appeal arises from a decision of the U.S. Court of Federal Claims. The Court of Federal Claims had jurisdiction under 28 U.S.C. § 1498(a). The Court of Federal Claims granted Elbit's, and the United States' (collectively "Defendants") judgment on the pleadings on July 20, 2015, and the Court of Federal Claims entered final judgment on July 21, 2015. Plaintiff Thales Visionix, Inc. timely filed a notice of appeal on September 16, 2015. This Court has jurisdiction under 28 U.S.C. §1295(a)(3).

# ISSUES PRESENTED

1.      Whether the Court of Federal Claims ("CFC") legally erred by holding all of the asserted system and method claims of U.S. Patent No. 6,474,159 ("the '159 Patent") not patent eligible under 35 U.S.C. § 101 for failing both the first and second step of the Supreme Court's *Alice* Test, even though the CFC recognized that the claims "primarily describe a system of sensors," A06, but held that, in failing *Alice* Step One, they are "directed to the abstract idea of tracking two moving objects, and incorporate laws of nature governing motion, both of which are ineligible for patent protection," A07, and in failing *Alice* Step Two, holding that the claims are "directed to the abstract navigation equation allowing for the tracking of a moving object's orientation relative to a moving reference frame." A09

2.      Whether the CFC legally erred by holding that the asserted claims of the '159 Patent preempt the use of the "navigation equation" after determining "the only feasible way to gather orientation data from moving objects and reference frames would be from devices like the ones broadly described in the patent." A09.

3.      Whether the CFC legally erred by holding that the asserted system and method claims of the '159 Patent fail both steps of the machine-or-transformation test, first because the patent "is not tied to a particular machine, but merely incorporates a range of fungible machines in its data-gathering process," and second for lack of transformation when "tracking information is derived from mathematical calculations *based on* a combination of the sensor data and natural laws of motion." A12 (emphasis in original).

4.      Whether the CFC legally erred in failing to consider the asserted dependent claims at all, much less their added structural limitations, as required by the Patent Statute, 35 U.S.C. § 284, and by *Alice*, holding instead that, because the dependent claims "all depend directly or indirectly on" the independent claims, A04, they too are patent ineligible.

## STATEMENT OF THE CASE

On June 16, 2014, Thales Visionix, Inc. ("TVI") sued the United States Government (the "U.S.") under 35 U.S.C. § 1498 for infringing TVI's '159 Patent relating to systems and methods for using inertial trackers to track motion relative to a moving platform. A02. The U.S. contracts with Lockheed Martin Corporation ("Lockheed Martin") for the F-35 Joint Strike Fighter ("F-35"). The F-35 employs a helmet-mounted display system ("HMDS") that Lockheed Martin obtains indirectly from Elbit Systems of America ("Elbit"). TVI asserted that Lockheed Martin infringes the '159 Patent by installing the patented technology in the F-35 fighter. *Id.*

After the U.S. answered the complaint, the CFC notified interested parties, including Lockheed Martin, Rockwell Collins, and Elbit. A03. Only Elbit responded and filed an answer on December 9, 2014. *Id.* On March 27, 2015, the U.S. and Elbit filed a motion for judgment on the pleadings alleging that the '159 Patent is invalid under 35 U.S.C. § 101 for claiming a "patent-ineligible law of nature." *Id.* After briefing was completed, the CFC heard oral argument on June 16, 2015. *Id.*

On July 20, 2015, the CFC granted Defendants' motion and dismissed the case. A13. The CFC held that all asserted claims of the '159 Patent failed *Alice* Step 1 because they are "directed to the abstract idea of tracking two moving

4

objects, and incorporate laws of nature governing motion, both of which are ineligible for patent protection." A07; *see also Alice Corp. Pty. Ltd. V. CLS Bank Int'l*, 134 S.Ct. 2347, 2355 (2014). The CFC also held that the claims of the '159 Patent failed *Alice* Step 2 because

> the '159 Patent is directed to the abstract navigation equation allowing for the tracking of a moving object's orientation relative to a moving reference frame. This overriding purpose of the patent "well overtake[s]" the concrete elements and data gathering steps, rendering the patent's subject matter ineligible under § 101.

A09. The CFC did not separately consider any of the asserted dependent claims or their added limitations, holding instead that "all depend directly or indirectly on Claim 1, and thus incorporate the same three limitations." A04.

TVI timely appealed. A902.

## STATEMENT OF FACTS

### I.    Inertial Sensors for Tracking Relative Motion

#### A.    Background Principles of Inertial Motion Tracking

Inertial motion tracking uses one or more inertial sensors alone or together in an inertial measurement unit ("IMU"). Inertial sensors are specific types of sensors that measure gravitational force or specific forces associated with changes in position or orientation. Examples of inertial sensors include accelerometers and gyroscopes. A22, 1:63–2:5, 2:30–44. Linear accelerometers attached to a moving object can be used to measure movement associated with

changes in the position of the object, e.g., forward-backwards, left-right, and up-down. Gyroscopes attached to a moving object can be used to measure movement associated with changes in the orientation of the object, e.g., pitch, roll, and yaw.

Because inertial navigation systems generally measure forces associated with *changes* in position or orientation of a moving object, to estimate position and orientation, those systems typically integrate the accelerations and rates relative to a starting position represented in a given coordinate frame (e.g., reference navigation frame). Such systems will typically estimate the current position, orientation, and velocity of a moving object using measurements from the IMUs. When the reference navigation frame is fixed, IMUs can be used to track the motion of an object in three-dimensional space. A23, 3:26–4:9; A15, Figure 1. Similarly, when the reference navigation frame moves, but in a predictable manner, such as rotation of the Earth, IMUs can be used to assist in navigating a vehicle or aircraft. A23–24, 4:10–5:59; A16, Figure 2. When operating in three-dimensional space, these measurements account for the complete six degrees of freedom (hereinafter, "6DOF"), i.e., both the linear (up-down, right-left, forward-backward) and rotational (roll, pitch, yaw), movement of an object in three-dimensional space, as depicted below:



Six Degrees of Freedom, available at https://en.wikipedia.org/wiki/Six_degrees_ of_freedom (last visited Jan. 14, 2016).

The sensors in an inertial sensor system provide nearly continuous information, allowing the 6DOF *pose* (position and orientation) of a moving object to be estimated relative to a particular mathematical coordinate frame of reference, e.g., a fixed navigation frame. A23, 3:25–29. Because practical applications usually require the 6DOF pose estimates in a different frame of reference, various matrices, vectors, and associated mathematical operators can be used to transform the "raw" information provided directly from the inertial

sensors into the 6DOF information represented in the desired frame of reference. A23, 3:31–33.

For example, the orientation of an object with respect to a fixed platform may be represented using a dynamically computed orientation matrix (e.g., a direction cosine matrix) that can be used to transform vectors from the object reference frame into the frame of the fixed platform. A23, 3:43–46. Such a dynamic orientation may be obtained by integrating measured angular rates with respect to a known initial orientation. A23, 3:46–53, 3:66–4:1. This updated matrix may then be used, for example, to transform measurements from accelerometers mounted on the moving object into the navigation frame, after which the accelerative force due to gravity (an ever-present vertical force with respect to the Earth) can be subtracted, and the result then can be doubly integrated to obtain an estimate of the object's position. A23, 3:53–4:1. Such a dynamic orientation transformation is necessary because the directions of the specific forces measured by the accelerometers mounted on the object are measured in a coordinate frame associated with the object, while said object is continually re-orienting with respect to the fixed navigation frame.

However, integrating inertial signals requires integrating the sum of the "true" (but unknown) motion signals and inevitable measurement errors, e.g., bias errors, scale errors, and random electrical noise. *See, e.g.,* A26, 9:25–52;

*see also* A383 (citing Ex. 1004 of Elbit's IPR Petition at 166). As the errors go uncorrected, the pose estimates (based on the integrated inertial signals) will unavoidably and rapidly drift away from the "true" pose. *Id.* While the rate of drift can be linear for single integration, it becomes quadratic for double integration. *See, e.g.,* A23, 3:43–65 .As such, to maintain accurate pose estimates, independent non-inertial measurements may be used to correct for "drift" errors. A22, 2:19-29.

For example, drift error correction may be accomplished by employing an additional, non-inertial sensor (e.g., optical, acoustic, or magnetic) to make independent measurements, which may then be mathematically combined with the IMU data via some form of a correcting means, such as a Kalman filter, to form more accurate estimates of the desired pose values (e.g., position, orientation, and velocities). A23: 4:1–9.

### B.   Traditional Inertial Motion Tracking Systems Had Several Drawbacks When Tracking Small Objects

While inertial tracking systems with drift correction have been used for a wide range of HMDS applications (A22, 1:5–15),[1] such prior art inertial

---

[1] Inertial tracking with drift correction has been used in virtual environment (VE) training, virtual prototyping, interactive visualization and design, VR gaming, and even fixed-base vehicle simulations. A22, 1:5–15.

tracking systems were deficient in applications that require tracking motion relative to a moving platform instead of relative to a fixed platform or to the Earth, especially when high precision and accuracy (e.g., millimeter accuracy) are important. A22, 1:23–25.

High precision and accuracy are critical when the user's simulated visual field must match its actual movement, and independent objects around it (e.g., enemy aircraft) must be accurately located. Imprecise or inaccurate pose estimates will cause misalignment between the actual physical world and simulated visual field. Perceptibly delayed pose estimates (e.g., as a result of multiple stages of processing) can lead to simulator sickness or can render a system unusable.

Prior art inertial tracking systems used for tracking small objects such as body parts tracked orientation but did not also produce position information. *See, e.*g., A22, 1:1–22. The signals produced by inertial sensors could be integrated to orientation (angular position) estimates. However, such orientation estimates would drift due to integration of a bias or noise in the output of the inertial sensors. A22, 1:22–42. The prior art recognized that the raw data from the inertial sensors could not be used directly to determine position in dynamic applications but had to be adjusted with the prior position information. A24, 6:17–63. For example, to correct drift in tilt, additional compensating

gravimetric sensors could be used to directly measure tilt, but measurements from these types of sensors are only reliable when the sensors are still (not moving). Thus, gravimetric sensors are inappropriate for tracking a moving object with respect to a moving platform. *Id*.

Because of these errors, prior art inertial sensor systems operating in 6DOF without separate drift correction would not function correctly. Such problems were particularly evident when employing a motion-base simulator (e.g., a flight simulator) or measuring an object's orientation, such as the head of a pilot, from the reference frame of an aircraft (i.e., moving platform). A24, 5:60–6:36. In such situations, the inertial sensors mounted to the head would measure head orientation relative to the ground (an inertial coordinate frame), while the drift-correcting sensors, mounted to the moving platform or aircraft, would measure head position relative to the moving vehicle platform. The error correcting filter (such as a Kalman filter) would attempt to fuse this inconsistent reference frame data, i.e., the ground and the aircraft (i.e., moving platform), but would produce unpredictable and incorrect results. A22, 1:32–42.

## II.     The '159 Patent Claims The Transformation of Raw Data From Inertial Sensors Into Accurate Relative Object Pose

### A.     InterSense, Inc. and Eric Foxlin

One of the inventors of '159 Patent,[2] Eric Foxlin, is a founder of InterSense, Inc. where he also was the Chief Technology Officer, leading the development of, *inter alia*, inertial sensor based trackers. Foxlin is recognized for his groundbreaking work in 3DOF (orientation) and 6DOF (position and orientation) motion estimation, for tracking an object (e.g., head or a body part) when both millimeter-level relative position accuracy and high relative orientation accuracy are required. Foxlin is an inventor on 23 U.S. Patents and at least 20 U.S. Patent Applications. Foxlin's U.S. Patent No. 5,645,077, "Inertial Orientation Tracker Apparatus Having Automatic Drift Compensation For Tracking Human Head And Other Similarly Sized Body" issued in 1997, disclosed the use of inertial trackers to track the movement of small bodies such as hands and heads with respect to a fixed reference frame.

In February 2012, Gentex Corporation purchased InterSense and merged it into its Visionix business unit. In 2013, the Thales Group, a multinational aerospace and defense company, purchased Visionix, including InterSense,

---

[2] The '159 Patent names inventors Eric Foxlin and Yury Altshuler (collectively, "Foxlin")

forming Thales Visionix, Inc. ("TVI"), the Appellant here. TVI designs, develops, and delivers helmet mounted display and motion tracking technology for defense and aerospace applications to customers worldwide.

### B.    Foxlin's Claimed Invention

Prior to Foxlin's invention claimed in the '159 Patent, those of skill in the art believed that, when tracking an object, such as a person's head, relative to a moving platform, such as an aircraft, a locally level, ground-based navigation frame (n-frame) should be used such that both the moving platform (p) and the user's head (h) could be tracked relative to the ground (n). In this way, the user's head pose could be calculated relative to the moving platform by transforming the estimates from one frame to the other. A24, 6:17–36. In simpler terms, the pose of the vehicle would be tracked with respect to the ground, the pose of the user's head would be tracked with respect to the ground, and the pose difference could then be computed. *Id.* Such a capability is desirable, in particular, in defense applications where a pilot must both visually track an object while flying—thus moving his or her head freely in space—and track that same object on computer systems connected to the pilot's helmet.

In addition, with respect to the prior art, if an inertial orientation tracking device did not produce accurate position information, only angular orientation information, a system could include an additional separate angular position

13

sensor to correct for drift. A22, 20–29. To estimate position, the prior art tracked the moving reference frame with respect to the ground and calculated a resolved position afterwards. However, the prior art did not have a solution for estimating position directly from the sensor signals. A15, Figure 1 (where "n" is the navigation frame).



A15, Figure 1 (prior art, identification of n-frame added).

Because of these limitations, inertial measuring systems in the prior art needed to maintain a clear path between the head or tracked object and an external reference point (n-frame), fixed in the environment, for determining drift-correcting measurements. A24, 6:17–36; A20, Figure 3B. In addition, if a clear line of sight between the vehicle, i.e., moving platform (x), and the ground, as well as the head, i.e., the tracked object (y), and the ground, could not be maintained, such as when flying an aircraft, these error correcting measurements

could not be made directly, even with a supplemental sensor, but rather were calculated based on independently estimated and then transformed pose data. As that data became more inaccurate, even more so did the results of the multiple coordinate transformation calculations. A24, 6:34–63.

Foxlin sought to address this problem from a different direction. Foxlin recognized that a system that operates without knowing, measuring, or calculating the orientation or position of the moving platform *relative to the ground* would solve the above problems. A25, 8:37–41. Instead of trying to calculate that force based on the moving platforms tilt angles with respect to ground, Foxlin discovered that using a reference inertial sensor mounted on the moving platform to *directly* measure the gravitational force on the moving platform removed the problems of compounded transformation errors. A25, 8:32–45. Those of skill in the art recognized Foxlin's critical insight because even the smallest of errors in estimates of the gravitational force can introduce very large pose estimation error.

Foxlin's discovery defied conventional understanding in inertial navigation systems, which was to resolve all pose estimates to a ground-based navigation frame (n-frame) that was a locally-level frame with its vertical axis aligned with the direction of local gravity. A25, 7:21–25; A15, Figure 1. Foxlin moved the traditional navigation reference frame ("n" frame) away from the

ground and affixed it to the moving platform, while also allowing it to re-orient (and move) freely with the moving platform. A25, 7:13–15, A18, Figure 3D. Foxlin then developed a new reference tracking system on board a moving platform, or aircraft, that transforms the raw inertial sensor data directly from a "tracking" IMU mounted on a moving object to be tracked and the raw inertial sensor data directly from a "reference" IMU mounted on a moving platform into relative orientation and position data, minimizing the compounding transformation errors. A25, 7:13–8:55.



A18, Figure 3D ("n" frame no longer based on ground but rather based on the object to be tracked, identification of new n-frame added).

### C.     The Patented System Uses Raw Inertial Sensor Readings To Accurately Determine Orientation And Position

The '159 Patent covers a discrete measurement apparatus and method that allows for using raw data directly from IMUs to accurately determine, without external inputs or error corrections, the orientation of one moving object relative to another moving object, in a self-contained system. A22, 1:34–39. One specific application of the invention is in fighter aircraft and associated helmets, which use a helmet mounted display system or "HMDS." Such an HDMS system requires accuracy to the millimeter in the estimates of the position of the head and any for any objects rendered in the HMDS. A14, Abstract; 6:64–67. In this application, the aircraft becomes the moving reference frame (or new n-frame) and the head or helmet is the object to be tracked (b-frame). A18, Figure 3D.

The '159 Patent describes the system of the claimed invention generally as a

> general-purpose tracking system that would work with any type of moving platform, and the installation would be simpler because the whole system would be installed on the inside [of the platform]. FIG. 3c illustrates the hardware for such a system, installed in a motion-base simulator cab.

A25, 7:5–9. The patentee described Figure 3C as "show[ing] tracking a head relative to a platform, using a self-contained system." A23, 3:12–13. Figure 3C, reproduced below,



complete system on moving platform

closed-top simulator cab

head tracking

moving platform

FIG. 3C
Annotated

depicts a pilot sitting in a "closed-top simulator cab," A24, 6:43, with the "system installed on the inside" of the cab. A25, 7:8. The '159 Patent also describes an exemplary implementation of the invention in a "specific tracking system configuration called IS-600 MPT," in Figure 4. A25, 8:57–60.



**FIG. 4**

IS-600MPT

Figure 4 shows a version of a prior art motion tracking system, the InterSense IS-600 Mark 2, modified to incorporate the invention and called the IS-600MPT. A25, 8:57–60.

The modified system has specific structure, including a tracked object or tracking station 420 (b-frame), "consisting of the tracking IMU 430 and two SoniDisc ultrasonic beacons 440 rigidly mounted on a strip about 6 inches long, … a rack-mount processor unit 450," and a reference X-bar 400, which holds the moving reference frame inertial sensors (n-frame), additional reference IMU 460 mounted at the center of the X-bar, and may include four ultrasonic receiver pods 410. A25, 8:62–68, A26, 9:12–13. The specification discloses that the processor unit 450 is specifically programmed to "gather[] the data from the

various sensors, perform[] integration and sensor fusion algorithms, and output[] the cooked 6-DOF data to a host by serial port." A25–26, 8:68–9:2. To perform these tasks, the processor unit 450 is specifically configured to include the additional structure:

> bias compensation units 465, an orientation integration unit 470 for integrating the orientation values, a velocity integration unit 475 for integration velocity values, a position integration unit 480 for integration position values.

A26, 9:3–7. An error estimator Kalman filter 485 also is provided. "All of these units receive correction values generated by the extended Kalman filter error estimator unit 485. The values generated by these units are fed into the motion prediction unit 490, which generates predicted motion values." A26, 9:7–11.

### D.    The Patented System May Be Located Entirely Onboard The System And Does Not Need Ground-Based Coordinate Data

The claims of the '159 Patent cover both a system and a method of using inertial sensors based on settings to provide data in both 3DOF and 6DOF to track the motion of an object in space relative to a moving reference frame. A22, 1:54–56. To obtain accurate relative pose estimates in this environment, as opposed to transforming all moving object and moving reference frame estimates to the Earth's reference frame to reconcile them, the invention directly processes the continuously provided raw sensor data from the tracked object and

the continuously provided raw sensor data from the moving reference platform. A24, 5:65–67. The '159 Patent teaches that such a novel method is necessary because unlike the Earth, an arbitrarily moving platform may be accelerating as well as rotating, cannot be assumed to be slow, may be maneuvering unpredictably, and does not offer a locally-level reference frame. A24, 6:5–9.

Contrary to the teachings of the prior art, by taking into consideration these modifications, without performing all computations related to the Earth as a fixed reference frame, transformation errors are minimized. This makes the Foxlin invention an order of magnitude more accurate than the prior art systems. A25, 7:13–40. In addition, in cases where only the relationship between the moving object and the moving reference frame is needed, the resulting self-contained system does not need to be provided with any external information about the reference platform motion relative to the Earth. A25, 11:34–39.

## III.    Proceedings Before The Court of Federal Claims

TVI asserted '159 Patent claim Nos. 1–5, 11–13, 20, 22–26, 32–34, and 41. Claim 1 is an independent system claim to which asserted claims 2–5, 11–13, and 20 depend. A27–28. Claim 22 is an independent method claim to which claims 23-26, 32-34, and 41 depend. A28. Shortly after TVI served its initial infringement contentions, Defendants filed a Motion for Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c). A224. The parties

briefed the motion, separately arguing the eligibility of each of the asserted claims. A247–51; A441–42.

### A. Hearing On Defendants' Motion For Judgment On The Pleadings

The CFC held a hearing on Defendants' Motion for Judgment on the Pleadings on June 16, 2015. At the hearing both sides made presentations to the court. First, Elbit and the U.S. argued that the '159 Patent's specification did not need to be considered in order to rule on section 101:

> I think fundamentally here the question will be putting aside what the specification discloses, what do the claims actually purport to encompass.

A795, 10:9–11. According to Defendants, the claims are "fundamentally drawn to [the] abstract idea or a law of nature that determining the relative orientation of two objects, it uses data from inertial sensors to do that." A797, 12:3–6.

While Defendants admitted that there was a split in authority on the legal standard for determining patent eligibility, they asserted that subject matter eligibility is a question of law rather than a mixed question dealing with underlying factual determinations, because here, "there are no facts that Your Honor needs to determine and make a finding on." A800, 15:6–18:20.

Defendants asserted to the court that, if the claim contains an algorithm, it is unpatentable:

> So, at bottom, Your Honor, I think the position that the Defendants have in this case is that fundamentally the determining is directed to an algorithm. As such, it is directed to ineligible subject matter.

A844, 59:16–19.

Defendants also informed the court that the claimed "inertial sensor" was a "generic element" that was "insufficient to add an inventive concept" to the claims. A821, 36:19–21. "[Inertial sensors] have been around for decades doing exactly what they do, and they have many different uses and applications." A822, 37:25–38:2; accord A823, 38:23–25. Defendants reiterated their position that the conventional use of inertial sensors in the claims did not alone impart patentability on several occasions. A825–26, 39:21–40:4; A834-35, 49:22–50:6. In accordance with that position, and implying that patent eligibility depended on the claimed inertial sensors being used in a novel way, Defendants concluded that:

> These sensors are being used in the context of this invention and for the same well understood, conventional, routine purpose they always have been, and that's simply not enough for patent eligibility.

A845, 60:2–5. Defendants did not discuss the claimed invention as a whole, e.g., the position of the claimed "inertial sensors" on the tracked object and the moving reference frame, much less the use of these "inertial sensors" to accurately determine orientation and data without external assistance.

Further, Defendants did not specifically argue the patent ineligibility of any of the dependent claims. Defendants minimized discussion of the dependent claims asserting merely:

> So, these are the only two independent claims in this patent [Claims 1 and 22]. All of the other claims depend either from Claim 1, the system claims, or Claim 22, which is the method claim.

A820, 35:19–22. And asserting:

> Those [dependent] claims … have additional elements, but those additional elements are data-gathering elements or additional processing elements, again, elements that are used for their well understood, conventional and routine purposes and insufficient to provide an inventive step. …

> Just by way of a brief example, Claim 2 and 23, which have inertial sensors comprising additional angular inertial sensors selected from a set of angular accelerometers, angular rate sensors, and angular position gyroscopes, this is just an additional list of these generic devices that are used for the purpose they've been used for decades.

A843-44, 58:24–59:15. At the hearing, Defendants provided no other discussion of the additional limitations found in the asserted dependent claims.[3]

In arguing that the claims preempted all uses of a "navigation equation," Defendants repeatedly dubbed the allegedly incorporated equation the *complete navigation equation* purportedly based on the patentee's own usage in the patent. A795, 10:20. Defendants used this phrase no fewer than nine times during the hearing. A795-841, 10:20; 13:12; 38:7; 42:6; 43:19; 44:8; 44:21; 53:11; 56:6.

However, the '159 Patent refers to what the Defendants adopted as a catch-phrase—the "complete navigation equation"—only once in discussing a specific embodiment for measuring the orientation of a tracked object with respect to the orientation of a moving reference frame in which the reference IMU is mounted at the origin of the n-frame. A25, 8:14–17. Patentee stated "[i]f the reference IMU is mounted at the origin of the n-frame, then it directly measures $f_{in}{}^n$ and $\omega_{in}{}^n$, so $(10)^{[4]}$ is the *complete navigation equation*, which can

---

[3] The same arguments were presented in Defendants' briefing, namely, that the dependent claims contain only "conventional data gathering instruments," or recited "well-known, prior art sensors." A247–51.

[4] Referring to equation (10) a few lines above in the specification: $\dot{v}_{nb}{}^n = C_b{}^n f_{ib}{}^b - \dot{\omega}_{in}{}^n \times r_{nb}{}^n - 2(\omega_{in}{}^n \times v_{nb}{}^n) - \omega_{in}{}^n \times (\omega_{in}{}^n \times r_{nb}{}^n) - f_{in}{}^n$. A25, 8:3,

be integrated using just data available from the two IMUs." A25, 8:14–17 (emphasis added).

## B.    CFC Decision Dismissing TVI's Case

On July 17, about a month after the oral hearing, the CFC granted Defendants' Motion for Judgment on the Pleadings holding that none of the asserted claims were patent eligible under 35 U.S.C. § 101. A01–13.

### 1.    Application of *Alice*

In applying "Alice Step One," A06, the CFC held that the asserted claims of the '159 Patent "failed the first prong" because they were directed to the "abstract idea of tracking two moving objects," and they incorporated "laws of nature governing motion, both of which are ineligible for patent protection." A07.

In addressing "Alice Step Two," A07, the CFC held that generic "inertial trackers, when considered as an ordered combination in the claimed system, add nothing transformative to the patent." A08. The CFC noted that the "claimed system does nothing to ground this abstract idea in a specific way." *Id.* The CFC further determined that "the patent allows for a wide variety of sensors to be

where the added information accounts for tangential, Coriolis, centripetal, and gravitational force.

employed to provide data for the navigation equation . . . ." *Id.*, (citing patent),

and that

> indicates that the patent is directed primarily to the equation itself,
> and the arrangement of fungible devices to receive and generate the
> necessary data does not transform the abstract nature of the patent's
> core claim: the navigation equation.

*Id.*

The CFC determined that the Supreme Court's *Alice* decision was not

"limited to business method patents when it laid out the test for patent eligibility

under § 101." A08. The CFC concluded that

> the '159 Patent is directed to the abstract navigation equation
> allowing for the tracking of a moving object's orientation relative
> to a moving reference frame. This overriding purpose of the patent
> "well overtake[s]" the concrete elements and data gathering steps,
> rendering the patent's subject matter ineligible under § 101.

A09.

### 2.    Application of Prior Supreme Court Precedent

The CFC analogized the claims of the '159 Patent to the claims in

*Diamond v. Diehr*, 450 U.S. 175, 188 (1981), and concluded that

> [u]nlike the limitations in <u>Diehr</u>, the claims here would virtually
> preempt the use of the navigation equation by others because the
> claims are overly broad in defining the system.

A09. The CFC based its conclusion on its understanding that

27

> claiming various generic inertial trackers and receivers for gathering orientation data … would preempt anyone who sought to use the equations because the only feasible way to gather orientation data from moving objects and reference frames would be from devices like the ones broadly described in the patent.

*Id.* The CFC further held "Plaintiff's system claim [not] to be transformative of anything." *Id.* (citations omitted). The CFC concluded that:

> While the Plaintiff here claims that attaching an inertial tracker both to a moving object and a moving reference frame is novel, its novelty does not approach the necessary inventiveness achieved by the claims in <u>Diehr</u> . . . . [and] is unpersuasive in the context of a § 101 analysis.

A09-10. Instead, the CFC found that the '159 Patent claims were "more akin to those rejected in *Parker v. Flook*, 437 U.S. 584 (1978)," which claimed a method of updating alarm limits during a catalytic conversion process but, which the Court held, were merely directed to the mathematical formula itself. A10.

### 3.    Machine-or-Transformation Test

Finally, the CFC held that all of the asserted claims, both system and method, failed the machine-or-transformation test (hereinafter, "MOT"), for determining patent eligibility of method claims, because "Plaintiff's claims here are not tied to any particular machine that is integral to the claimed method of determining the relative orientation of two tracked objects." A11. Instead, the CFC held that the '159 Patent failed the first step of MOT because:

the inertial sensors can be a range of devices, including angular accelerometers, angular rate sensors, and angular position gyroscopes. '159 Patent at l:63-67. The claims do not seek to improve upon inertial sensor technology and do not modify their capabilities; rather the inertial sensors fill the role of gathering data to feed into the navigation equation and improve upon the field of motion tracking.

A12, and additionally failed the first step of MOT, because the '159 Patent "is not tied to a particular machine, but merely incorporates a range of fungible machines in its data-gathering process." *Id.*

As to the second step of MOT, the CFC analyzed the raw sensor data claimed in the '159 Patent independent claims and held that this "data is entered into a navigation equation and solved to provide the moving object's position and orientation relative to a moving reference frame." A12. According to the CFC, "data is not fed into one side of a machine and pushed out the other as something new." *Id.* Hence, the CFC held that the '159 Patent claims failed the second step of the MOT for lack of transformation. *Id.*

In dismissing the case on the pleadings, the CFC held that "the scope of the subject patent's claims is insufficiently limited under the holdings of *Mayo* and *Diehr*, and if the patent were considered to protect eligible subject matter, it would preempt the use of the underlying abstract idea of relative motion tracking by others in the field." A13.

### IV.    Co-pending Proceedings Before The Patent Trial And Appeal Board

On April 23, 2015, prior to the hearing on Defendants' Motion for Judgment on the Pleadings, Elbit filed a Petition for *Inter Partes* Review (IPR) before the Patent Trial and Appeal Board (PTAB). TVI elected not to respond to the Petition, and a trial for the IPR was instituted on October 26, 2015. Contrary to the CFC's holding that the '159 Patent claims' "novelty does not approach the necessary inventiveness . . . ." A10, in the IPR, Elbit did not argue lack of novelty under 35 U.S.C. § 102, electing instead to base its petition entirely on obviousness, 35 U.S.C. § 103. A326–91, A337.

Elbit placed a different subset of claims at issue in the IPR than TVI had asserted in the CFC case. A336–37. Specifically, Elbit asserted '159 Patent claim Nos. 1–7, 10–13, 20, 22–28, 31–34, and 41 were obvious under 35 U.S.C. § 103 based on various combinations of three prior art references. A337. The IPR is proceeding before the PTAB, with TVI's Response to Elbit's Petition due February 5, 2016.

## V.    The Claims At Issue On Appeal

The asserted and appealed claims are reproduced below:

1. A system for tracking the motion of an object relative to a moving reference frame, comprising:

a **first inertial sensor** mounted on the tracked object;

a **second inertial sensor** mounted on the moving reference frame; and

an **element** adapted to receive signals from said first and second inertial sensors and configured to determine an orientation of the object relative to the moving reference frame based on the signals received from the first and second inertial sensors.

2. The system of claim 1 in which the first and second inertial sensors each comprises **three angular inertial sensors** selected from the set of angular accelerometers, angular rate sensors, and angular position gyroscopes.

3. The system of claim 2, in which the angular inertial sensors comprise **angular rate sensors**, and the orientation of the object relative to the moving reference frame is determined by integrating a relative angular rate signal determined from the angular rate signals measured by the first and second inertial sensors.

4. The system of claim 3, further comprising a **non-inertial measuring subsystem** for making independent measurements related to the orientation of the object relative to the moving reference frame, and for using those measurements for correcting drift that may occur in the inertial orientation integration.

5. The system of claim 4, in which the **non-inertial measuring subsystem** is selected from the set of optical, acoustic, magnetic, RF, or electromagnetic technologies.

\* \* \* \*

11. The system of claim 2, in which the first and second inertial sensors each further comprises **three linear accelerometers**.

12. The system of claim 11, further comprising **an element for calculating the position** of the object relative to the moving reference frame.

13. The system of claim 12, in which the calculating element **double-integrates** a relative linear acceleration signal computed from the linear accelerometer signals measured by the first and second inertial sensors.

\* \* \* \*

20. The system of claim 1, in which the moving reference frame is associated with **a vehicle**, and the second inertial sensor comprises **a pre-existing inertial measurement unit** on a vehicle that was installed for the purpose of navigation.

A27, '159 Pat, 11:50–13:19 (structure limitations emphasized).

22. A method comprising determining an orientation of an object relative to a moving reference frame based on **signals from two inertial sensors mounted respectively on the object and on the moving reference frame**.

23. The method of claim 22 in which the two inertial sensors each comprise **three angular inertial sensors** selected

from the set of angular accelerometers, angular rate sensors, and angular position gyroscopes.

24. The method of claim 23, in which the angular inertial sensors comprise **angular rate sensors**, and the orientation of the object relative to the moving reference frame is determined by integrating a relative angular rate signal determined from the angular rate signals measured by the first and second inertial sensors.

25. The method of claim 24, further comprising making independent measurements with a **non-inertial measuring** subsystem related to the orientation of the object relative to the moving reference frame, and using those measurements for correcting drift that may occur in the inertial orientation integration.

* * * *

32. The method of claim 23, in which the first and second inertial sensors each further comprises **three linear accelerometers**.

33. The method of claim 32, further comprising **calculating the position** of the object relative to the moving reference frame.

34. The system of claim 33, further comprising **double-integrating a relative linear acceleration** signal computed from the linear accelerometer signals **measured** by the first and second inertial sensors.

41. The method of claim 22, in which the moving reference frame is associated with **a vehicle**, and the second

inertial sensor comprises **a pre-existing inertial measurement unit** on a vehicle that was installed for the purpose of navigation.

A28, 13:25–14:59 (structure limitations emphasized).

## SUMMARY OF ARGUMENT

Eric Foxlin's invention as set forth in the '159 Patent claims a navigation tracking system that measures the relative pose of a moving object based on information from one or more inertial sensors on the object and one or more inertial sensors on a moving reference frame, without requiring the system to compute pose with respect to the Earth. Foxlin's invention provided a streamlined and accurate tracking system, applicable in defense applications, among others, that minimized the prior art's vexing problem of rapidly compounding errors from interfering sources and that could be mounted entirely onboard an aircraft or other vehicle. Foxlin claimed his invention using a combination of elements familiar to him as one of skill in the art, and he used functional language to further explain how his combination of those known elements provided a new and exciting advancement in his field.

Yet, the CFC erred in picking apart his claim and finding fault with individual limitations, never looking at the claimed invention as a whole. The CFC's decision here creates an unduly high burden for inventors to satisfy even to be eligible for patent protection. The decision requires individual claim elements to satisfy multiple eligibility requirements that, even if proper, were designed to be applied to the claimed invention as a whole.

Progress of precedent in this direction will have a chilling effect on the inventing community. At the outset, in the CFC's view, "accompanying diagrams and background sections of the patent are irrelevant" to determining whether his claims are patent eligible, A06, requiring the patent claims to be all encompassing of the invention. However, according to the CFC, that same specification may be used against the patentee: the "only feasible way to gather orientation data from moving objects and reference frames would be from devices like the ones broadly *described* in the patent," A09 (emphasis added); the specification "*describe*[s] equation (10) as the 'complete navigation equation,' . . ." A04 (emphasis added, CFC's logic for improperly reading in equation (10) to the claims).

Second, according to the CFC, claim terms that have "widespread acceptance" in the field or that cover a "range" of objects, are "generic terms" not appropriate for patent eligibility, A11, and are "potentially endless in their scope." A09. Third, the CFC condemned functional claim language an "abstract idea . . . and incorporate[s] laws of nature . . . , both of which are ineligible for patent protection," even when that functional language specifically describes how the claim elements work together to achieve the invention. A07.

Such steep requirements provide accused infringers with virtual carte blanche to remove asserted claims from a patent at the pleading stages of litigation, just as was done here. This Court should provide guidance to the trial courts on

application of precedent to prevent the scourge of overreaching patent invalidity decisions from shutting down an inventor's ability to protect his life's work.

The CFC legally erred by holding Foxlin's claimed invention not patent eligible. It's overarching error was analyzing each of the claim elements individually, finding that each one failed some part of the section 101 analysis, but never analyzing the asserted claims as a whole. First, by holding that the claimed functional language was were directed to an improper "abstract idea" and improperly incorporated a "law of nature," an "equation," A07, when the functional language is properly used limit the claimed combination to "determine an orientation of the object relative to the moving reference frame based on the signals received from the first and second inertial sensors." A27, 11:55-59.

Second, the CFC legally erred by extracting part of the claimed structure, "first inertial sensor" and "second inertial sensor," and considering that structure in isolation to conclude that "its novelty does not approach the necessary inventiveness achieved by the claims in Diehr." A09-10. By separating the structure from the claim as a whole, and specifically, from its functional language, the CFC violated the rule common to all modern-day Supreme Court jurisprudence on section 101:  the "patent claims must be considered as a whole." The CFC similarly analyzed "object" and "moving reference frame." A09.

Yet, the '159 Patent's claimed structure in combination with its specific location in the system and its defining functional language represents classic claim drafting strategy consistent with section 101's requirement that "inventions" and "discoveries" involving "any new and useful" process or machine or "improvement thereof . . . ," are patent eligible under 35 U.S.C. § 101. The decision of the CFC should be reversed.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(c), where the CFC held that the asserted claims fail to satisfy 35 U.S.C. § 101, this Court reviews *de novo*. *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1352 (Fed. Cir. 2014) (reviewing District Court grant of motion for judgment on the pleadings arguing patent claims were invalid under 35 U.S.C. § 101); *In re Comiskey*, 554 F.3d 967, 975 (Fed. Cir. 2009).

## ARGUMENT

### I.     The Court May Rule That The Asserted Claims Are Patent Eligible

Here, as the CFC explicitly held, the determination of whether claims satisfy section 101 in the context of Federal Rule of Civil Procedure 12(c) is a legal one:

> Judgment on the pleadings under Rule 12(c) of the Court ("RCFC") is appropriate only where there are no material facts in dispute . . . . The Court must assume each well-pled factual allegation to be true, and give all inferences in favor of the non-movant . . . .

A05 (internal citations omitted). Defendants agreed that patent eligibility was a pure question of law. A799, 14:9–13; *see also* A800, 15:14-17; *see also supra* Statement of Facts (hereinafter, "Facts"), Section III.A. The CFC, therefore, granted Defendants' Motion for Judgment on the Pleadings:

the patent is seeking protection for the mathematical formulae used in determining relative orientation of two moving objects. The Court is unwilling to afford patent protection to Plaintiff's claim on this building block of motion tracking technology.

A13.

Hence, the Court here may rule that the appealed claims are patent eligible, remanding to the CFC for the case to proceed on TVI's claims of infringement. Compare *Lexington Luminance LLC v. Amazon.com Inc.*, 601 F. App'x 963, 972 (Fed. Cir. 2015) (nonprecedential) (vacating grant of motion for judgment on pleadings as to indefiniteness, holding the claim definite, and remanding to district court to proceed with construction of the claims).

## II.    Under *Alice*, None Of The Asserted Claims Are Unpatentably Abstract

Although, on several occasions, the Supreme Court has held that "laws of nature, natural phenomena, and abstract ideas" are not patent eligible, *Diehr*, 450 U.S. at 185, the Court has cautioned that "we tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice,* 134 S.Ct. at 2354, citing *Mayo Collaborative Servs. v. Prometheus Labs. Inc.*, 132 S.Ct. 1289, 1297 (2012). Yet "swallowing patent law" is exactly what the appealed decision does.

### A.    Step One:  The Claims Are Not "Directed To" A Law of Nature Or An Abstract Idea

As noted by the Supreme Court as recently as 2012, no doubt, "all inventions . . . [in some way] embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 132 S.Ct. at 1293. Therefore, it is legal error for a court to hold patent claims ineligible simply because they may involve some abstract concept they believe to separable from the invention. *See Diehr*, 450 U.S. at 187.[5] Indeed, there is much more to the analysis. *Alice* Step 1 is not concerned with identifying "any" abstract idea, rather it is focused on finding a claimed "patent ineligible" abstract idea. *Alice*, 134 S.Ct. at 2355.

However, in its attempt to analyze the claims under *Alice* Step One, the CFC legally erred when, it held that:

> the independent claims of the '159 Patent are directed to mathematical equations for determining the relative position of a moving object to a moving reference frame. Derived from Newtonian principles of motion and "borrowing the mathematics that an inertial navigation system uses to track an airplane relative to a rotating earth," . . . [T]he Court finds that this concept is a "building block of human ingenuity," . . .

A07.

---

[5] At the outset, the claims are limited to proper "categories of invention," namely, a "system" or machine and a "process" or method. A27-28, 11:50–14:18; *see*, 35 U.S.C. § 101; *see also* A3652 (USPTO Interim Guidance on Subject Matter Eligibility indicating system claims comprising "a device or set of devices" is properly directed to a machine, meeting *Alice* Step One).

### 1.    The Claims Require A Specific Structural Combination With Appropriate Functional Language

The claims of the '159 Patent recite discrete structures. Each of the claimed systems and methods require at least two inertial sensors, an object, and a moving reference frame. *See, e.g.,* A27, 11:50–60 (e.g., Claim 1). The claims then require the structure be specifically located on the system and provide functional language to further limit the claimed invention and clarify the relationship between these distinct structures. For example, each of the claims require that the inertial sensors are specifically "mounted on the tracked object," (e.g., a helmet) and "mounted on the moving reference frame" (e.g., an aircraft). *Id.* Similarly, Claim 1 requires that an "element" be (i) "adapted to receive signals from the inertial sensors"; and (ii) "configured to determine an orientation of the object relative to the moving reference frame." *Id.*

The presence of functional language in a claim does not, *ipso facto*, mean it is drawn to a law of nature or an abstract idea. *See, e.g., DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014) (holding claims directed to a computer system configured to carry out a process recited patent eligible subject matter). Rather, as directed by the United States Patent and Trademark Office (USPTO), "There is nothing inherently wrong with defining some part of an invention in functional terms. Functional language does not, in and of itself, render

42

a claim improper." Manual of Patent Examining Procedure § 2173.05(g) (9th ed. Mar. 2014) ("MPEP").

Indeed, as here, functional claim language often follows structural limitations. For example, in *In re Schreiber,* the claims were directed to a conical spout (the structure) that "allow[ed] several kernels of popped popcorn to pass through at the same time" (the function). *In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997). As noted in *Schreiber,* "[a] patent applicant is free to recite features of an apparatus either structurally or functionally." *Id*. That is precisely what the patentee did in the '159 Patent.

### 2. The Functional Language Does Not Improperly Cover A Law of Nature or An Abstract Idea

Critical to the CFC's *Alice* Step One analysis is the concept that the claims "are directed to mathematical equations … [d]erived from Newtonian principles." A07. As an initial matter, none of the '159 patent claims recite a particular equation. A27–28, 11:50–14:18. In making its determination, the CFC took its cues from Defendants, e.g., A795, 10:20; Facts III.A., and rather than rely on the claim language as explained by the specification,[6] A795, 10:9–11, the CFC imported

---

[6] "The Court must first determine whether the patent claims at issue are, on their face, directed to an abstract idea, law of nature, or natural phenomenon. The accompanying diagrams and background sections of the patent are irrelevant to this analysis." A06.

equation (10) dubbing it "the navigation equation" allegedly required by all the claims. A04*; see also* A25, 8:4.

The CFC legally erred by failing to consider each claim "as a whole," and ignoring express structural limitations in the claim. *See, e.g., Alice*, 134 S.Ct. at 2355, n. 3, citing *Diehr*, 450 U.S. at 188. By distilling the claimed invention to just a "navigation equation," the CFC wrongfully encapsulated the claims as "a building block of human ingenuity," noting "the solution lies in the mathematical formula[], not the generic devices listed in [the claims]." A07 (internal quotations and citations omitted).[7]

Yet, this represents an artificial and willful separation of elements comprising the whole of each claim at issue. The structural features of the claims are critical in defining the invention as a concrete "structure or process which … is performing a function which the patent laws were designed to protect," not merely an abstract idea, and thus cannot be ignored. *Diehr*, 450 U.S. at 192. The structural aspects ignored by the CFC do not merely carry out mathematical concepts described in the specification. Rather, they define a discrete structural environment that allows for determining relative orientation by processing of real-time, raw

---

[7] As discussed in further detail *infra*, whether the devices recited in the claims are "generic" is irrelevant because the Supreme Court has expressly held that they cannot be ignored in the context of a section 101 analysis. Section II.B.1.a.

measurements obtained from the claimed inertial sensors. The advantage of the claimed system is that relative orientation can be determined in the claimed environment, without the need for further extraneous manipulation of data taken from additional structure on a fixed reference frame. A25, 8:37–41.

Contrary to the CFC's determination that the specification was unnecessary, when analyzing a claim under *Alice*, "it is often useful to determine the breadth of the claims" by consulting the specification. *See, e.g., Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369-70 (Fed. Cir. 2015) (consulting specification to understand nature of the claim at issue). Indeed, the specification confirms that the claimed structures cannot be ignored, as they are essential to the claimed invention. In addition, the specification explains that equation (10) relates to a specific embodiment of the invention where "the reference IMU is mounted at the origin of the n-frame . . . " A25, 8:14–15. Thus, even when used with the claimed invention, equation (10) is not an abstract concept, but limited by the structures recited in the claims, and does not broadly claim the concept of "tracking two moving objects," as found by the CFC. A07.

For this reason, the claims, as a whole, are not directed to an abstract idea, rather they satisfy *Alice* Step One. The decision of the CFC should be reversed.

## B.    Step Two:  The Claims Recite A Patent-Eligible Application Of An Idea

Even if the Court were to determine that the claims are directed to a law of nature or abstract idea, the claims satisfy *Alice* Step two because they recite a patent eligible application of an idea. *Alice*, 134 S.Ct. at 2350. Claims incorporating algorithms, or equations, *may* fall under the prohibited category of "abstract idea," if the claims are found to preempt other uses of the algorithm. *See, e.g., Flook*, 437 U.S. at 584; *Gottschalk v. Benson*, 409 U.S. 63 (1972). However, even if a claim does include an algorithm, it is not improperly abstract if the algorithm is combined with other elements to accomplish a particular goal. *See, e.g., Flook*, 437 U.S. at 590 ("a process is not unpatentable simply because it contains a law of nature or a mathematical algorithm"); *Diehr*, 450 U.S. at 187; *California Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 991 (C.D. Cal. 2014) (finding claim directed to mathematical formula was patent eligible because it "reflects inventive concepts" and "sets forth unconventional steps" for solving a problem). To be sure, all patent claims by their nature preempt some use, but the preemption concern becomes secondary when patent claims more than "building blocks of human ingenuity." *Alice*, 134 S.Ct. at 2354–55 (internal citations omitted); *see also Mayo*, 132 S.Ct. at 1932-94.

The Supreme Court has described step two of this analysis as "a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S.Ct. at 2355 (quoting *Mayo*, 132 S.Ct. at 1294) (internal quotations omitted, alteration in original). The "inventive concept" of the section 101 analysis is not analogous to a novelty determination under section 102. Rather, it asks merely if the claims cover the type of "process, machine, manufacture, or composition of matter" that section 101 envisions as patent eligible. *See, e.g., Diehr*, 450 U.S. at 190 ("The question therefore of whether a particular invention is novel is wholly apart from whether the invention falls into a category of statutory subject matter") (internal citations omitted). Here, the claims cover a "combination of elements" that form a system of inertial sensors specifically arranged to collect information (e.g., acceleration, angular rate) and continuously provide raw data to a processing element that transforms that data into relative orientation information. A25, 7:50–8:55; *see also Alice*, 134 S.Ct. at 2355.

1.    **The Claimed Inertial Sensors Limit The Scope To A
Patent Eligible Navigation Invention**

a.    ***The Claimed Inertial Sensors Are Not Patent
Ineligible "Generic Data Gathering Elements"***

In its application of *Alice* Step Two, the CFC improperly held that the claimed inertial sensors are "generic data gathering elements" inappropriate for patent eligible subject matter. A06. Again, the CFC relied on Defendants' urging that the claimed inertial sensors, taken in isolation, can be ignored, because they were somehow "generic" and not used in a "novel" way. A08.[8] In analyzing the claimed inertial sensors separately from the invention as a whole, the CFC held

> the system claim fails to transform the method claim into a patent-eligible invention. The plain language of Claim 1 describes *generic, fungible inertial sensors that admittedly have already gained "widespread acceptance"* in the field of motion tracking.

*Id.* (emphasis added). Yet, Supreme Court and this Court's precedent require consideration of the limitations of a claim "*as an ordered combination,*" rather than simply individually. *Alice*, 134 S.Ct. at 2355, citing *Mayo*, 132 S.Ct. at 1298 (emphasis added). The CFC's failure to do so is reversible error.

Compounding its error in isolating claim limitations for individual consideration, the CFC found that the claimed inertial sensors are "already in usage

---

[8] Elbit does not dispute that the claimed invention is "novel." In its IPR Petition, Elbit conceded novelty under section 102, choosing instead to rely entirely on alleged obviousness. A337.

in the art," "generic," and "fungible." A08. Yet, there is no requirement that individual claim limitations cover elements that are new to the art, used in a novel way, not generic, and not fungible. *See, e.g., Diehr*, 450 U.S. at 188–89 ("It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis."); *see also DDR*, 773 F.3d at 1258, n.5 ("On a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions."); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–19 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.").

Additionally, while there is no prohibition on claiming "generic" elements such as a "nail" or a "screw" or even a "sensor," the claimed "inertial sensors" fail to satisfy the PTO's definition of "generic computer components," which are parts of a general purpose computer such as a "memory" and a "processor" used to perform basic computer functions such as "storing" and "processing." *See e.g*., U.S. Patent & Trademark Office Interim Guidance on Subject Matter Eligibility (July 2015 Update: Subject Matter Eligibility), p. 7 (available at www.uspto.gov/sites/default/files/documents/ieg-july-2015-update.pdf).    Also, contrary to the CFC's characterization, the inertial sensors are not "generic data

gathering elements," at least because the specification discloses that the "processor unit … gathers the data from the various sensors …." before performing its specific functions A25, 8:66-67. Far from "generic computer components" of a "general purpose computer," inertial sensors are specific types of navigation sensors that measure change in motion. A22, 1:35-40. Inertial sensors include gyroscopes and accelerometers. *See supra* Facts, Section I.A.; *see also* A22, 1:64–67, 2:63. In addition, the CFC did not even address the asserted dependent claims that further refine the specific types of inertial sensors, e.g., angular accelerometers, angular rate sensors, and angular position gyroscopes. A27, 11:61–63, 13:30–36; *see, infra*, II, B.1.c. and V.

By introducing "novelty" requirements into its holding, the CFC improperly applies a more rigorous standard for a section 101 analysis than what is laid out in *Alice*. Yet, such concepts are reserved for section 102 or 103. *See, e.g.,* 35 U.S.C. § 102(a) ("A person shall be entitled to a patent unless–(a) the invention [i.e., the entire claim] was known or used by others in this country, or patented or described in this or a foreign country, before the invention thereof by the applicant for patent."); *see also United States v. Adams*, 383 U.S. 39, 51-52 (1966) (in the obviousness context, noting that combining known prior art elements is not sufficient to render the claimed invention obvious).

There is no requirement that each claim limitation be new; the real inquiry is whether the claim as a whole, considering all of the limitations in combination, is new or nonobvious, and Congress decreed that such inquiry is made under Sections 102 and 103. *Intellectual Ventures I LLC v. Symantec Corp. et* al, No. 2015-1769 (Amicus brief of The Honorable Paul R. Michel Supporting Neither Party at 10) (hereinafter, "Michel Amicus Brief"). The search for "inventive concept" described that the Supreme Court is not a search for individual claim limitation novelty. Rather, it refers to the inclusion of "additional features [in a claim] to ensure that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]. *Alice,* 134 S.Ct. at 2357 (internal quotations omitted).

### b. *The Special Purpose "Element" Adds Additional Structure To The Claims*

The system claims also require an "element" that is "adapted to receive signals from the first and second sensors" and "configured to determine an orientation of the object relative to the moving reference frame" based on those received signals. A27, 11:55–59. Here, the "element" is specifically configured to transform the continuously provided raw inertial data from the inertial sensors into relative pose information. *Id*. The specification describes the claimed "element" in one embodiment as a processor unit 450 including bias compensation unit 465, orientation integration unit 470, velocity integration unit 475, position integration unit 480, and a Kalman filter for error estimation 485. A26, 8:66–9:9. The

specification further teaches that the "element" "gathers the data from the inertial sensors, performs integration and sensor fusion algorithms" using its subparts discussed above, and transforms the raw signals into "cooked 6-DOF data" useful to a host, such as a pilot-worn helmet in an HMDS. *Id.*

Hence, claim 1, for example, requires limitations including a tracked object, a moving reference frame, two inertial sensors specifically mounted on the tracked object and the moving reference frame, and the specifically configured element that receives the raw signals from the inertial sensors and transforms them into relative orientation. A11, 11:50–59. These are precisely the type of claim limitations provided for in the patent statute. 35 U.S.C. § 101; *see also* MPEP § 2173.05(g).

### c. *The Dependent Claims Add Further Patent Eligible Subject Matter*

In addition to the structural limitations found in independent Claim 1, the dependent claims add further structure. For example, Claim 2 specifies that the inertial sensors include "three angular inertial sensors" selected from a limited set. A27, 11:61–62. Claim 3 requires that the inertial sensors are a specific type of inertial sensors: an angular rate sensor whose relative angular rate signals are integrated to determine the orientation of the object. A27, 11:64–12:2. Claim 4 adds a non-inertial sensor to correct compounding errors caused by drift. A27, 12:3–8. Claim 5 follows up by specifying the type of non-inertial sensors that are

covered:  optical, acoustic, magnetic, RF, or electromagnetic. A27, 12:9–11. Claim 11 further requires the inertial sensors to be specifically "three linear accelerometers." A27, 12:38–40. Claim 12 adds a new element to calculate the "position of the object relative to the moving reference frame"; claim 13 provide functional language to specify how this calculating element determines position: by "double-integrat[ing] a relative linear acceleration signal computed from the linear accelerometer signals measured by the first and second inertial sensors." A27, 12:41–47. Finally, dependent claim 20 specifies that the moving reference frame is associated with a "vehicle," and the second inertial sensor includes a "preexisting inertial measurement unit" located on a vehicle and installed for the purpose of "navigation" [9] A28, 13:16–19.

Contrary to the CFC's proclamation about all of the asserted claims being directed "primarily to the navigation algorithm," the asserted claims are anything but broadly directed to a navigation algorithm. Instead the claimed structural limitations are specifically located and perform defining functions.

---

[9] Dependent method claims 23–26, 32–34, and 41 add similar limitations. A28, 13:32–46, 14:13–59.

2. **The Claims Solve Known Error Problems When Tracking A Moving Object, Such As A Head, From A Moving Platform, Such As An Aircraft**

In addition to the multitude of structural limitations that define the scope of the asserted claims as patent eligible, *Alice* clarified that the abstract-ideas exception does not apply if the invention "solve[s] a technological problem in 'conventional industry practice,'" "improve[s] an existing technological process," or otherwise "effect[s] an improvement in any other technology or technical field." *Alice*, 134 S.Ct. at 2358–59.

Here, the claims solve the "technological problem" that:

> standard inertial tracking systems . . . will not function correctly if operated on a moving platform such as a motion-base simulator or vehicle. The inertial sensors would measure head motion relative to the ground, while the drift-correcting range sensors would measure head pose relative to the vehicle platform in which the reference receivers are mounted. While the vehicle is turning or accelerating, the Kalman filter would attempt to fuse inconsistent data and produce unpredictable results.

A22, 1:33–42. Indeed, the '159 Patent walks through the multitude of changes that the inventor made to the prior art in order to "find a method of measuring … [position] directly, without having to track the vehicle with respect to the ground as well and to compute the pose difference afterwards." A25, 7:2–5. Figure 3C discloses a hardware embodiment of the invention showing "tracking a head relative to a platform, using a self-contained system." A18; A23, 3:14–15; *see also* Facts, Section II.C. *supra*. Figure 4 discloses a specific configuration of the inertial

tracking system and block diagram. A19; A23, 3:16–17; *see also* Facts, Section

II.C. *supra*.

The patent specification further discloses that a key or "inventive concept"

of the claimed invention is:

> [the] use [of] the ***reference IMU*** [inertial sensors on moving reference frame] to measure the gravitational field in the ***n-frame*** [moving reference frame] at every time step, instead of trying to calculate it[.] The key that makes this approach possible is the realization that it is not necessary to explicitly compensate for the effect of the Earth's gravitation on the ***b-frame accelerometers*** [inertial sensors on the tracked object].

A25, 7:40–45 (claim limitations emphasized). The specification further explains

that:

> By measuring the effect of gravity directly on the ***n-frame*** [moving reference frame] with a ***reference IMU*** [inertial sensors on the moving reference frame], we do not need to know the platform tilt angles to resolve the gravity vector into the ***n-frame***. Thus this system operates independently without any inputs from the motion base controller or the vehicle attitude reference system, and without the need to ever know or measure or calculate the orientation or position of the ***moving platform*** [moving reference frame].

A25, 8:34–41 (describing a 6OF system, identification of claim limitations

emphasized).

Therefore, even if the Court rules that the claims do not satisfy *Alice* Step One, all of the claims satisfy *Alice* Step Two because the "inventive concept" claimed by the '159 Patent is the ability to use raw signals from inertial sensors to "track[] the motion of an object relative to a moving reference frame." A27, 11:50–51.

Because each of the asserted claims independently satisfies ***each*** step of the *Alice* test, the CFC decision must be reversed.

### III.    The CFC Legally Erred In Holding That The Claims Preempt The "Idea" of Motion Tracking

In analyzing the Supreme Court cases of *Mayo*, *Diehr*, and *Flook*, the CFC erred in holding that the "claims here would virtually preempt the use of *the navigation equation* by others because the claims are overly broad in defining the system." A09 (emphasis added). To support this finding the CFC reasoned that the "claims would preempt anyone who sought to use the equations because *the only feasible way* to gather orientation data from moving objects and reference frames would be from devices like the ones broadly described in the patent." *Id.* (emphasis added).

Here, the CFC is dead wrong for at least two reasons. First, contrary to the CFC's unsupported conclusion, pose data could be gathered by using many types of non-inertial sensors, such as optical, acoustic, magnetic, RF or electromagnetic

technologies. A22, 2:5-11.[10] Thus, the claimed invention is not "the only feasible way" to "gather orientation data . . . ," as the CFC held. A09.

Second, contrary to the CFC's holding, the '159 Patent cannot be stripped down to a single equation. Rather, the claims identify a particular structural environment that leverages known concepts of motion tracking in the field of inertial sensors to determine relative orientation within that field. Because the Supreme Court has held that such applications are entitled to protection under the patent laws, the CFC's preemption holding cannot stand. *See Diehr*, 450 U.S. at 188-189.

## IV. The CFC Legally Erred In Holding That The Asserted Claims Failed To Satisfy The Machine-or-Transformation Test

The Supreme Court in *Bilski v. Kappos* held that, while the Machine-or-Transformation test may be a "useful clue" as to patent eligibility of process claims, it is not the sole test available to the Court. 561 U.S. 593, 603 (2010). Here, in attempting to confirm patent ineligibility, the CFC erroneously held that all of the asserted claims violated the "machine-or-transformation" test (hereinafter, "MOT"). A11–13.

---

[10] Notably, Defendant Elbit's own later patent claims an apparatus "for determining the position of a selected object relative to a moving reverence frame" using electromagnetic tracking. U.S. Patent No. 7,640,106, 18:59–19:53; *see also id.* at 2:17–21 ("Electromagnetic (EM) tracking operates on a different principle than inertial tracking").

Without differentiating between the system and the method claims, the CFC made a series of unnecessary determinations to finally hold that "[n]either the [claimed] 'tracked object' nor the [claimed] 'moving reference frame' … are particular machines, as neither has a limiting definition." A11. Further, according to the CFC, because the inertial sensors "can be a range of devices, including angular accelerometers, angular rate sensors, and angular position gyroscopes," that "fill the role of gathering data to feed into the navigation equation and improve upon the field of motion tracking," they are "not tied to a particular machine, . . ." A12. Yet, this is the same improper argument made by the CFC with respect to the *Alice* test, *supra*, Section II., and it fails for the same reasons.

## A.    The System Claims Cover A Machine, Not Appropriate For Application Of The Machine-Or-Transformation Test

Here, Foxlin defined his invention both as a process ("method") and an apparatus ("system"). *See* 35 U.S.C. § 101; A11, 11:50–14:50. Traditionally, however, MOT applies only to process claims to determine if section 101 is satisfied. *See, e.g., Bilski*, 561 U.S. at 602; *Benson*, 409 U.S. at 63, *Flook*, 437 U.S. at 585; *Diehr*, 450 U.S. at 187. The logic behind the distinction is two-fold. First, an apparatus claim is a "machine," thus satisfying step one on its face and ending the analysis. Second, the test is designed as a tool in analyzing method claims, and particularly software-type claims, to ensure they include some grounding structure, without which their coverage would be unknown. *Id.* at 605. Therefore, MOT

requires method claims (1) to be linked to a particular machine in a non-trivial manner or (2) to transform an article into another state. *Id.* at 602–04.

By contrast, here the CFC held that all of the asserted claims, both process and system, fail to satisfy section 101. *Id.* Application of the MOT to the asserted system claims is an improper expansion of the test unsupported by precedent and should be reversed. *Bilski*, 561 U.S. at 602-04.[11]

### B.    The Methods Claims Satisfy Step One Of The Machine-Or-Transformation Test

Under the first step of MOT, the claim must include a particular machine. *Bilski*, 561 U.S. at 602–04. Yet, the CFC held that "Plaintiff's claims here are not tied to any particular machine that is integral to the claimed method of determining the relative orientation of two tracked objects. A11. The CFC looked at the individual limitations to determine if each was a machine:  "Neither the 'tracked object' nor the 'moving reference frame' identified in the claims are particular machines, as neither has a limiting definition." *Id.* With respect to the claimed sensors, the CFC held that they "fill the role of gathering data to feed into the navigation equation and improve upon the field of motion tracking." A12. According to the CFC, because "the claims do not seek to improve upon inertial

---

[11] If the Court were to conclude that the MOT applies to apparatus and system claims, then TVI relies on its analysis of MOT for the appealed method claims. *See Supra* IV.B.1.

sensor technology and do not modify their capabilities, the claims are not tied to particular machine. A12. Yet, once again, the CFC failed to consider the claimed invention as a whole, which at a minimum requires the combination of a tracked object, a moving reference frame, two specifically mounted inertial sensors, that determines pose information of the object relative to the moving reference frame. *See Alice*, 134 S.Ct. at 2355, n. 3, citing *Diehr*, 450 U.S. at 188; *see also* A28, 13:44 – 14:59.

### 1.   Claims 22-26 and 41 Require The Particular Combination Of Limitations To Non-Conventionally Calculate Relative Orientation

Claims 22–26 require a machine specifically designed to "determine orientation of an object relative to a moving reference frame based on signals from two inertial sensors." A28, 13:24–27. In addition to the two inertial sensors specifically located on the object and the moving reference frame, the claims require other specifics of the machine. Claim 23 specifies that each of the two inertial sensors in the machine must include "three angular inertial sensors selected from the set of angular accelerometers, angular rate sensors, and angular position gyroscopes." A28, 13:28–31. On top of that, Claim 24 requires the angular inertial sensors are angular rate sensors. A28, 13:32–36. The patent further specifies that the specifically designed machine determines orientation of a moving object

relative to a moving reference frame non-conventionally by "integrating the relative angular rate signals" measured by the two inertial sensors. A28, 13:24–27.

The specification teaches that the machine's implementation is non-conventional because it avoids errors caused by the fusion of "inconsistent data" and thereby avoids "unpredictable results." A22, 1:39–41. The claimed machine "measures" real-time data at every step "instead of trying to calculate it" as previously was done. A25, 7:40–42. Therefore, contrary to the prior art, the machine does not require outside inputs. A25, 8:34–41. Further, claims 25 and 26 add an additional "non-inertial measuring subsystem" to the machine to correct for "drift." The non-inertial measuring subsystem is further defined to be either optical, acoustic, magnetic, RF, or electromagnetic. A28, 13:38–46. Finally, claim 41 requires the "second inertial sensor" to include a "pre-existing inertial measurement unit" located on a "vehicle" and that was "installed" specifically for "navigation." A28, 14:55–59.

Because the machine that performs the methods of claims 22–26 and 41 is specifically defined and limited as above, these asserted claims pass the first step of MOT. *See, e.g., Bilski*, 561 U.S. at 602–04.

### 2. Claims 33 and 34 Require The Particular Combination Of Limitations To Non-Conventionally Calculate Relative Position

Similarly, claims 33 and 34 also require a machine specifically designed to "determine orientation of an object relative to a moving reference frame based on signals from two inertial sensors." A28, 13:24–27. In addition to the two inertial sensors, the machine must include "three angular inertial sensors selected from the set of angular accelerometers, angular rate sensors, and angular position gyroscopes." A28, 13:28–31. Claims 33 and 34 also require the inertial sensors to include linear accelerometers. A28, 14:9–11. Finally, claim 33 uses the specific machine to measure object position relative to the moving reference frame, and claim 34 specifies that the measurement is done by "double-integrating a relative linear acceleration signal computed by the linear accelerometer signals measured by" the inertial sensors. A28, 14:10–18.

Because the machine that performs the methods of claims 33 and 34 is specifically defined and limited as above, claims 33 and 34 pass the first step of MOT. *See, e.g., Bilski*, 561 U.S. at 602–04.

### C.    The Method Claims Satisfy Step Two, Transforming Raw Data From Inertial Sensors Into Accurate Pose Information

Because the appealed claims satisfy the first step of MOT, they do not need to be analyzed under the second "transformation" step of MOT. *SiRF Tech., Inc. v. International Trade Com'n*, 601 F.3d 1319, 1332–33 (Fed. Cir. 2010). However, the claims satisfy the transformation step of MOT as well.

Again, by failing to consider the invention as a whole, the CFC erred in holding that entry of data "into a navigation equation and solved to provide the moving object's position and orientation relative to a moving reference frame" fails to satisfy the transformation requirement of MOT because TVI merely seeks to "patent a mathematical formula." A12.

Even if the Court holds that the claims include a mathematical formula, contrary to the CFC's analysis, the claimed method requires real-time "transformation" of raw "signals from two inertial sensors," specifically located on the tracked object and the moving reference frame, into useful and accurate pose information using the specifically claimed arrangement. A28, 14:9–11. Hence, the claims satisfy MOT part 2, which confirms their patent eligibility under section 101. *See, e.g., Bilski*, 561 U.S. at 602–04.

Contrary to the CFC's determination, these claims are similar to the claims that survived in *Diehr*. The claimed invention determines relative orientation by acquiring raw data from the inertial sensors, in real-time, rather than relying on

calculated estimates based on old position and orientation information. A24-25, 6:64–7:12. This tracks the Supreme Court's analysis in *Diehr*, where the contribution in the art was not the use of an equation, but rather "the continuous measuring of the temperature inside the mold cavity, the feeding of this information to a digital computer which constantly recalculates the cure time, and the signaling by the computer to open the press, [which] are all new in the art." *Diehr*, 450 U.S. at 179. And unlike the invention in *Flook*, the continuous real-time determination of relative orientation by monitoring the variable forces acting on both the tracked object and the moving reference frame set the claimed invention apart. *See id.*, at 186-187 (distinguishing *Flook*). Because the asserted method claims are closer to *Diehr* than to *Flook*, they satisfy the MOT, and the CFC's determination of patent ineligibility must be reversed.

### V.    The Court of Federal Claims Legally Erred By Failing To Consider The Asserted Dependent Claims

In rendering this decision, the CFC only analyzed independent claims 1 and 22, and failed to separately consider the at-issue dependent claims. A06. Therefore, the CFC legally erred when it held that:

> the scope of the subject patent's claims is insufficiently limited under the holdings of Mayo and Diehr, and if the patent were considered to protect eligible subject matter, it would pre-empt the use of the underlying, abstract idea of relative motion tracking by others in the field.

A13. Although the CFC recognized that "Claims 2-21 depend on Claim 1, the independent system claim, and Claims 23-42 depend on Claim 22, the independent method claim," A03, the CFC erred when it held that because the dependent claims "incorporate the same … limitations" found in the independent claims, they are *per se* ineligible. A04. Hence, the CFC failed to consider the additional limitations and structure added to the appealed claims, relying entirely on its analysis of the independent claims.

The patent statute, however, requires an independent analysis of each asserted claim:

> A patent shall be presumed valid. **Each claim of a patent** (whether in independent, dependent, or multiple dependent form) **shall be presumed valid independently of the validity of other claims**; **dependent** or multiple dependent **claims shall be presumed valid even though dependent upon an invalid claim**. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

35 U.S.C. § 282 (emphasis added). Precedent also is well settled. *See, e.g., Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1316–17 (Fed. Cir. 2002) (vacating and remanding the district court's summary judgment of invalidity under 35 U.S.C. § 102 because the dependent claims were never separately addressed), citing 35 U.S.C. § 282. "Because dependent claims contain additional limitations, they cannot be presumed to be invalid … just because the independent claims from which they depend have been properly so found." *Sandt Tech., Ltd. v.*

*Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1356 (Fed. Cir. 2001) (vacating the district court's holding claims 2, 4–18, and 20–21 invalid under § 103 because the court did not separately address those claims).

Because the CFC failed to consider the dependent claims at all, much less the additional limitations and structure those claims provide, either individually or in combination, the case must be reversed.

## CONCLUSION

Because the asserted claims of the '159 Patent satisfy 35 U.S.C. § 101, the decision of the Court of Federal Claims be reversed.

March 2, 2016                         Respectfully submitted,

                                     /s/ Christopher B. Ferenc
                                     Meredith Martin Addy
                                        *(Principal Counsel)*
                                     Michael A. Dorfman
                                     Martin S. Masar III
                                     KATTEN MUCHIN ROSENMAN LLP
                                     525 W. Monroe Street
                                     Chicago, IL 60661
                                     (312) 902-5200
                                     (312) 902-1061 (Facsimile)
                                     meredith.addy@kattenlaw.com
                                     michael.dorfman@kattenlaw.com
                                     martin.masar@kattenlaw.com


                                     Christopher B. Ferenc
                                     KATTEN MUCHIN ROSENMAN LLP
                                     2900 K Street NW
                                     Washington, D.C. 20007
                                     (202) 625-3500
                                     (202) 339-6044 (Facsimile)
                                     christopher.ferenc@kattenlaw.com

            *Counsel for Plaintiff-Appellant Thales Visionix, Inc.*

**CERTIFICATE OF SERVICE**

I certify that today, March 2, 2016, I electronically filed the foregoing Corrected Brief for Plaintiff-Appellant Thales Visionix, Inc. with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit using the appellate CM/ECF system. Counsel of record for all parties will be served by the appellate CM/ECF system.

Dated:   March 2, 2016                     /s/ Christopher B. Ferenc

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,386 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

Dated:  March 2, 2016                    /s/ Christopher B. Ferenc

# ADDENDUM

**ADDENDUM**

**TABLE OF CONTENTS**

| Docket Number | File Date | Document | Appendix No. |
|---|---|---|---|
| 061 | 07/20/2015 | Opinion and Order | A1–A13 |
| 062 | 07/21/2015 | Final Judgment | A901 |
| -- | -- | U.S. Pat. No. 6,474,159 | A14–28 |

# In the United States Court of Federal Claims

No. 14-513C

(Filed: July 20, 2015)

```
*******************************************
                                          *
THALES VISIONIX, INC.,                    *
                                          *
                Plaintiff,                *
                                          *
v.                                        *
                                          *      Patent Infringement Claim; Helmet-
THE UNITED STATES,                        *      Mounted Display System; F-35 Joint
                                          *      Strike Fighter Aircraft; Motion
                Defendant,                *      Tracking Technology; 35 U.S.C. §
                                          *      101; Patent Eligibility Analysis.
ELBIT SYSTEMS OF AMERICA, LLC,            *
                                          *
                Third-Party Defendant.    *
                                          *
*******************************************
```

*Anthony W. Shaw*, with whom were *Craig S. King*, *Aziz Burgy*, *Taniel E. Anderson*, *Ahmed Abdel-Rahman*, and *Brian J. Stevens,* Arent Fox LLP, Washington, D.C., for Plaintiff.

*Andrew P. Zager*, Trial Attorney, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, and *John Fargo*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for Defendant.

*Kurt G. Calia*, Covington & Burling LLP, Redwood Shores, California, with whom were *Sarah Wilson*, *Ranganath Sudarshan*, *Matthew Kudzin*, *John A. Kelly*, and *Z. Lily Rudy*, Covington & Burling LLP, Washington, D.C., for Third-Party Defendant.

## OPINION AND ORDER ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

WHEELER, Judge.

Plaintiff Thales Visionix, Inc. ("TVI") is a Maryland corporation and a wholly owned subsidiary of Thales Defense & Security, Inc. TVI designs and develops helmet-mounted display and motion-tracking technology for defense and aerospace applications. TVI brings this action under 28 U.S.C. § 1498 alleging the unlicensed and unlawful use by the United States of TVI's

U.S. Patent No. 6,474,159 ("the '159 patent"). The technology involved in the '159 patent relates to motion-tracking relative to a moving platform.

TVI alleges that its patented technology is critical to the success of the F-35 Joint Strike Fighter ("F-35"), the first tactical fighter jet in 50 years without a heads-up display system. A heads-up display system shows tactical information on a transparent surface inside the cockpit and within the pilot's forward line of sight. One disadvantage of traditional heads-up display systems is that the pilot must look straight ahead at the display in order to read tactical information, target enemy aircraft, and fire weapons. The F-35 is "revolutionary" in that it employs a helmet-mounted display system ("HMDS"). Compl. 2. The HMDS projects tactical information onto the interior of the visor of the pilot's helmet. Thus, the pilot does not need to look straight ahead at a fixed point to receive the displayed information. The HMDS further allows the pilot to target enemies and fire weapons in all directions. This capability enhances the pilot's situational awareness and his ability to combat enemy aircraft. Id. at 2-3.

A major technical challenge in designing an HMDS is that the displayed information must be updated constantly to correlate with the direction the pilot is looking. Id. at 3. The orientation of the helmet relative to the moving aircraft must be continuously tracked to provide current and accurate information to the HMDS. Id. Even a small interval of time between helmet rotation and the presentation of visual data, called latency, can cause a mismatch of information expected and information presented. Id. This slight delay can cause pilot disorientation and nausea. Id. A latency as small as five milliseconds can induce such adverse effects. Id. The challenges of delivering this information and reducing latency are "especially acute" when the frame of reference (the aircraft) is moving independently of the helmet. Id.

The U.S. Patent and Trademark Office ("PTO") issued the '159 patent, titled "Motion-Tracking," on November 5, 2002. Id. at 4. TVI owns the '159 patent by assignment from the inventors. The '159 patent describes and claims systems for using inertial trackers to track motion relative to a moving platform instead of relative to the earth. Id. Prior to the patent application, inertial trackers had gained widespread acceptance as "high-performance, robust, and cost-effective alternatives to magnetic, optical, and acoustic tracking systems." Id. Specifically, the '159 patent claims a "system" consisting of two inertial tracking sensors, one mounted on the tracked object and the other on a moving reference frame, and a receiver configured to process the information. Id. The system is used for determining the orientation of the tracked object relative to the moving reference frame. Id. Though Plaintiffs repeatedly point to using the system with an HMDS and an F-35 fighter jet, the patent claims are not specific to this use.

TVI filed its complaint in this Court on June 16, 2014. TVI alleges that Lockheed Martin Corporation, a prime contractor to the U.S. Government on the F-35 project, obtains the HMDS or its components from Rockwell Collins ESA Vision Systems, LLC ("Vision Systems"). Id. at 5. Vision Systems is a joint venture between Rockwell Collins and Elbit Systems of America. TVI alleges that Lockheed Martin's HMDS employs the same system of inertial trackers mounted on the helmet and the F-35 jet as claimed in the '159 patent. Id. Accordingly, TVI asserts that Lockheed Martin infringes on the '159 patent by installing this technology in the F-35 jets. Id.

2

TVI brings two counts of patent infringement of the '159 patent. Count One is brought against the United States Government, and Count Two is brought against Lockheed Martin, with the authorization and consent of the United States.

The Government filed its answer and moved to notify interested parties on October 14, 2014. The Court sent notices to Lockheed Martin, Rockwell Collins, and Elbit Systems of America, LLC ("ESA") advising them of their opportunity to participate in this case as a third-party defendant. Only ESA responded, and it filed an answer to the complaint on December 9, 2014. On March 27, 2015, the United States and ESA filed a motion for judgment on the pleadings, alleging that the '159 patent is invalid under 35 U.S.C. § 101 because it claims a "patent-ineligible law of nature." Defs.' Mot. 1. TVI responded to the motion on May 4, 2015, arguing that the '159 patent claims are directed to patent-eligible subject matter and do not preempt the field of inertial tracking or the use of Newton's equations. The Government and ESA replied on May 14, 2015, and TVI filed a surreply on May 18, 2015. The Court heard oral argument on the motion on June 16, 2015. The motion is ready for decision.

Factual Background

The parties agree that the '159 patent at issue in this case is extraordinarily complicated, yet the parties disagree in describing the complexity. TVI asserts that in 2000, when the inventors filed their patent application, "inertial trackers [had] not been used in applications that require tracking motion relative to a moving platform instead of relative to the earth." Pl.'s Resp. 3; '159 Patent at 1:23-25. Indeed, "standard inertial tracking systems . . . [would] not function correctly if operated on a moving platform such as a motion-based simulator or vehicle." '159 Patent at 1:32-35. The inventors allegedly solved this problem with the system described in their patent. Pl.'s Resp. 3. In contrast, Defendants argue that the complicated nature of the patent derives solely from the mathematical equations for determining relative orientation between two moving objects, and that the "system" is merely a generic, physical application of the mathematical formulae. Defs.' Mot. 11-19.

The patent contains 42 claims, two of which are independent. Claims 2-21 depend on Claim 1, the independent system claim, and Claims 23-42 depend on Claim 22, the independent method claim. Claim 1 states:

1. A system for tracking the motion of an object relative to a moving reference frame, comprising:

[1] a first inertial sensor mounted on the tracked object;

[2] a second inertial sensor mounted on the moving reference frame; and

[3] an element adapted to receive signals from said first and second inertial sensors and configured to determine an orientation of the object relative to the moving reference frame based on the signals received from the first and second inertial sensors.

3

'159 Patent at 11:50-59. Claims 2-21 all depend directly or indirectly on Claim 1, and thus incorporate the same three limitations. Claim 22, the independent method claim, states, "a method comprising determining an orientation of an object relative to a moving reference frame based on signals from two inertial sensors mounted respectively on the object and on the moving reference frame." '159 Patent at 13:24-27. TVI argues that the placement of a second inertial sensor on the moving reference frame is unique, and allowed the inventors to overcome any novelty or obviousness rejections at the PTO. Pl.'s Resp. 5.

In the "Background of the Invention" section of the patent, the inventors acknowledge that inertial trackers had already been "successfully applied to a wide range of HMD [head mounted displays] applications." '159 Patent at 1:10-17. Inertial trackers had achieved "widespread acceptance as a high-performance, robust, and cost-effective alternatives [*sic*] to magnetic, optical, and acoustic tracking systems." Id. The inventors go on to describe kinematic equations involved in inertial tracking relative to a fixed platform. Id. at 3:27-4:9. They then review "basic equations of terrestrial navigation" for inertial tracking relative to the rotating earth. Id. at 4:52-54. These equations were "primarily a source of inspiration" for the section dealing with tracking a moving body relative to another moving body. Id. at 4:10-15. Then, "borrowing" these mathematics, the inventors made "modifications" to account for the motion of a moving platform instead of the earth. This modification requires an inertial measurement unit ("IMU") to measure a variable angular rate vector for the moving object (for example, a fighter jet) instead of using the more constant angular rate vector of the rotating earth. Id. at 6:1-4.

The inventors show the work for their mathematical formulae in the "Detailed Description" section of the patent. They describe equation (10) as the "complete navigation equation," and note that it "can be integrated using just data available from the two IMUs." Id. at 8:14-17. The inventors' simulation results also focus on the success of the "kinematic algorithms." Id. at 11:21-27. Ultimately, the invention requires the inertial trackers to gather orientation data from the moving object and moving reference frame and then apply that data to the navigation equation. The legal question before the Court is whether this system of generic inertial trackers and a novel navigation equation together form a patentable subject matter.

## Jurisdiction

The Court has jurisdiction to hear claims against the United States Government for patent infringement. 28 U.S.C. § 1498(a) ("Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.").

4

<u>Standard of Review</u>

Judgment on the pleadings under Rule 12(c) of the Court ("RCFC") is appropriate only where there are no material facts in dispute. See <u>Forest Labs, Inc. v. United States</u>, 476 F.3d 877, 881 (Fed. Cir. 2007). The Court must assume each well-pled factual allegation to be true, and give all inferences in favor of the non-movant. <u>Owen v. United States</u>, 851 F.2d 1404, 1407 (Fed. Cir. 1988). Because patents are presumed to be valid, even under a § 101 analysis, Defendants bear the burden of establishing invalidity by "clear and convincing evidence." <u>Microsoft Corp. v. i4i Ltd. P'ship</u>,131 S. Ct. 2238, 2242 (2011); see also <u>CLS Bank Int'l v. Alice Corp. Pty. Ltd.</u>, 717 F.3d 1269, 1284 (Fed. Cir. 2013) (holding that the presumption of validity applies to challenges under § 101). Thus, "[a] Rule 12(c) motion for judgment on the pleadings challenging patent eligibility must be shown by clear and convincing evidence appearing in the patent itself." <u>Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA LLC</u>, No. 13 C 4417, 2014 WL 983123, at *2 (N.D. Ill. Mar. 13, 2014).

Section 101 of the Patent Act defines subject matter eligibility. In Section 101 jurisprudence, the Supreme Court has identified three categories of subject matter that cannot be patented: "laws of nature, physical phenomena, and abstract ideas." <u>Bilski v. Kappos</u>, 561 U.S. 593, 601 (2010). These categories are excluded from patentable subject matter because they are the "basic tools of scientific and technical work." <u>Alice Corp. Pty. Ltd. v. CLS Bank Int'l</u>, 134 S. Ct. 2347, 2354 (2014) (citation omitted). "[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." <u>Id.</u> (citation and quotation marks omitted). However, "an *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." <u>Mayo Collaborative Servs. v. Prometheus Labs., Inc.</u>, 132 S. Ct. 1289, 1293-94 (2012).

The modern test for patent eligibility, derived from <u>Alice</u>, consists of two parts: (1) a court must determine whether the patent claims at issue are directed to an abstract idea, law of nature, or natural phenomenon; and (2) if so, the court must consider whether the elements of each claim, both individually and as an ordered combination, transform the nature of the claim into a patent-eligible application. <u>Alice</u>, 134 S. Ct. at 2355. The second prong often is referred to as the search for an "inventive concept" and requires the patent to amount to "'significantly more than a patent upon the [ineligible concept] itself.'" <u>Id.</u> (quoting <u>Mayo</u>, 132 S. Ct. at 1294).

Whether asserted patent claims are invalid for failure to claim statutory subject matter under Section 101 is a question of law. <u>In re Comiskey</u>, 554 F.3d 967, 975 (Fed. Cir. 2009). Invalidity under Section 101 is a "threshold test," <u>Bilski</u>, 561 U.S. at 602, and may provide grounds for granting judgment on the pleadings. See, e.g. <u>Ultramercial, Inc. v. Hulu, LLC</u>, 772 F.3d 709 (Fed. Cir. 2014) (affirming district court's grant of 12(b)(6) motion to dismiss based on Section 101 invalidity); <u>buySAFE, Inc. v. Google, Inc.</u>, 765 F.3d 1350, 1352 (Fed. Cir. 2014) (affirming district court's grant of motion for judgment on the pleadings based on Section 101). The Court declines to perform any claim construction before ruling on the validity of the claimed subject matter, as Plaintiff has failed to identify a claim term that requires construction. See <u>Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada,</u> 687 F.3d 1266, 1273 (Fed. Cir. 2012).

5

Discussion

## A. Alice Step One

The Court must first determine whether the patent claims at issue are, on their face, directed to an abstract idea, law of nature, or natural phenomenon. The accompanying diagrams and background sections of the patent are irrelevant to this analysis. Similarly, Plaintiff's attempts to characterize the patent as a complicated system involving a fighter jet and pilot helmet are immaterial to the Court's Section 101 analysis. Accenture Global Servs., GmbH v. Guidewire Software, Inc., 728 F.3d 1336, 1345 (Fed. Cir. 2013) ("Regarding [Appellant's] argument concerning the complexity of the specification . . . the important inquiry for a § 101 analysis is to look to the claim."). Further, when a "system claim and method claim contain only 'minor differences in terminology [but] require performance of the same basic process' . . . they should rise or fall together." Id. at 1344 (quoting CLS Bank, 717 F.3d at 1291). Here, the Court looks to the two independent claims in the patent: Claim 1 and Claim 22.

Claim 1 is the system claim, describing a system comprised of two inertial sensors and an element adapted to receive signals from the sensors. This element is "configured to determine an orientation of the object relative to the moving reference frame." '159 Patent at 11:50-59. The element is configured to employ the claimed navigation equations in order to determine the relative orientation of the moving object. Thus, although this claim primarily describes a system of sensors, it is clear that the claim is "directed to" the determining step accomplished by the element's configuration to perform the navigation equations. Put simply, the system in Claim 1 appears to be an arrangement of generic data-gathering elements designed to feed orientation data into the navigation equations, which are described in Claim 22.

Claim 22, the method claim, even more directly describes the navigation equations by reciting, "a method comprising determining an orientation of an object relative to a moving reference frame. . . ." '159 Patent at 13:24-27. The orientation of the object is represented mathematically by an orientation matrix. Id. at 8:6-8. The orientation matrix is calculated using the angular velocities determined by the inertial sensors, and solved in equation (11). Id. at 8:5-8; Defs' Mot. at 11. This orientation matrix is then plugged into the complete navigation equation, equation (10). Distilled to its core, Claim 22 is nothing more than an instruction to solve a navigation equation.

The Court must decide whether a system of generic inertial sensors and a receiving element (Claim 1), combined with an instruction to solve a navigation equation (Claim 22), satisfies the first part of the Alice test. Other recent cases from the Supreme Court and the Federal Circuit are instructive.

The petitioner in Alice was the assignee of patents that disclosed a scheme for mitigating "settlement risk," or the risk that only one party to a financial agreement will satisfy its obligation. Alice, 134 S. Ct. at 2349. The patent claims were designed to facilitate the exchange of financial

6

obligations between two parties by using a computer system as a third-party intermediary. Id. The patents claimed (1) a method for exchanging financial obligations, (2) a computer system configured to carry out the method, and (3) a computer-readable medium containing program code for performing the method of exchanging obligations. Id. In its analysis, the Court "distinguish[ed] patents that claim the 'buildin[g] block[s]' of human ingenuity, which are ineligible for patent protection, from those that integrate the building blocks into something more. . . ." Id. at 2350 (quotation marks and citation omitted).

The Supreme Court held that, although the claims involved a computer application and a multi-step process of accomplishing risk mediation, they were *directed to* the "abstract idea of intermediated settlement." Id. The Court referred in its reasoning to the holdings in Gottschalk v. Benson, 409 U.S. 63 (1972), Parker v. Flook, 437 U.S. 584 (1978), and Bilski v. Kappos, 561 U.S. 593 (2010). The Court explained that the concept of intermediated settlement is a "fundamental economic practice long prevalent in our system of commerce." Alice, 134 S. Ct. at 2350 (internal quotation marks omitted). Thus, the claims in Alice failed the first prong.

Here, the Court similarly finds that TVI fails the first prong of the Alice analysis because the independent claims of the '159 Patent are directed to mathematical equations for determining the relative position of a moving object to a moving reference frame. Derived from Newtonian principles of motion and "borrowing the mathematics that an inertial navigation system uses to track an airplane relative to a rotating earth," the navigation equation is undoubtedly a complex mathematical concept, and a solution to the problem of tracking two moving objects in relation to each other. '159 Patent at 5:63-65. However, the Court finds that this concept is a "building block of human ingenuity," and the solution lies in the mathematical formulae, not the generic devices listed in the system claim. See Alice, 134 S. Ct. at 2350. Accordingly, TVI's claims fail the first prong of the Alice analysis because the claims are directed to the abstract idea of tracking two moving objects, and incorporate laws of nature governing motion, both of which are ineligible for patent protection.

### B. Alice Step Two

The Supreme Court in Alice then examined the claims under the second prong to search for an inventive concept that would "transform that abstract idea into a patent-eligible invention." Id. However, the Court did not find one. "Simply appending conventional steps, specified at a high level of generality, to a method already well known in the art is not *enough* to supply the inventive concept needed to make this transformation." Id. (quoting Mayo, 132 S. Ct. at 1300) (internal quotation marks omitted). Nor is limiting the use of an abstract idea to a particular technological environment enough for patent eligibility. Id.; Bilski, 561 U.S. at 611. Indeed, "wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" Alice, 134 S. Ct. at 2350-51; Mayo, 132 S. Ct. at 1297. Importantly, the Supreme Court found that when the system claims were considered as an ordered combination, the computer components added nothing that was not already present when the steps were considered separately. Alice, 134 S. Ct. at 2351; Mayo, 132 S. Ct. at 1298.

7

Here, the system claim fails to transform the method claim into a patent-eligible invention. The plain language of Claim 1 describes generic, fungible inertial sensors that admittedly have already gained "widespread acceptance" in the field of motion tracking. Like the computer elements in <u>Alice</u>, these inertial trackers, when considered as an ordered combination in the claimed system, add nothing transformative to the patent. Although the concept of tracking the motion of a moving object relative to a moving reference frame may have been novel and nonobvious, the claimed system does nothing to ground this abstract idea in a specific way. The claims allow for the application of the navigation equation in almost endless environments, and are not limited to a fighter jet and a pilot's helmet.

The Court rejects Plaintiff's attempts to construe its claims more narrowly and less abstractly. <u>See, e.g.</u>, <u>In re TLI Commc'ns LLP Patent Litig.</u>, No. 1:14md2534, 2015 WL 627858, at *10 (E.D. Va. Feb. 6, 2015) (rejecting patentee's argument to narrowly characterize the abstract idea underlying the claims "because it focuses incorrectly on a concrete application of the idea . . . instead of properly focusing at a higher level of generality on the abstract idea or concept underlying the [] patent."). In fact, the patent allows for a wide variety of sensors to be employed to provide data for the navigation equation, including angular accelerometers, angular rate sensors, and angular position gyroscopes. '159 Patent at 1:63-67. The Court finds that this allowance for variance among generic, widely-used devices to provide data for the equation indicates that the patent is directed primarily to the equation itself, and the arrangement of fungible devices to receive and generate the necessary data does not transform the abstract nature of the patent's core claim: the navigation equation.

Plaintiff argues that <u>Alice</u> has a limited effect, and applies primarily to business method patents. Yet the Court is aware of at least three post-<u>Alice</u> cases invalidating a patent under § 101 that involved a "technological" claim instead of an "entrepreneurial" claim. <u>See, e.g.</u>, <u>Synopsys, Inc. v. Mentor Graphics Corp.</u>, No. C 12-6467 MMC, 2015 WL 269116, at *2 (N.D. Cal. Jan. 20, 2015) (a system for converting a hardware independent user description of a logic circuit); <u>In re TLI</u>, 2015 WL 627858, at *3 (a system to simplify transmission of digital images); <u>Celsis In Vitro, Inc. v. CellzDirect, Inc.</u>, No. 10 C 4053, 2015 WL 1523818, at *2 (N.D. Ill. Mar. 16, 2015) (a method for producing hepatocytes capable of being frozen and thawed). The Court is not persuaded that <u>Alice</u> was limited to business method patents when it laid out the test for patent eligibility under § 101.

In a report and recommendation to the U.S. District Judge for the Western District of Texas, U.S. Magistrate Judge Jeffrey C. Manske performed an analysis similar to the one required for the case at bar. <u>Affinity Labs of Texas, LLC v. Amazon, Inc.</u>, 2015 WL 3757497 (June 12, 2015 W.D. Texas). In that case, the independent claims comprised a network-based media managing system for maintaining a library of content that a given user has a right to access, and which delivered content over a network to a user's wireless device. In considering whether the purpose of the patent was abstract, the Magistrate's report concluded that "the inclusion of 'some concrete claim elements – even elements associated with computer- or Internet-based technology – is insufficient to indicate that the claims as a whole are not directed to an abstract idea, if those elements are well

8

overtaken in the claim by the articulation of the abstract idea itself.'"  Affinity Labs, 2015 WL 3757497, at *8 (quoting TriPlay, Inc. v. WhatsApp Inc., 2015 WL 1927696, at *11 (citations omitted)).  The Court here has come to the same conclusion, that the '159 Patent is directed to the abstract navigation equation allowing for the tracking of a moving object's orientation relative to a moving reference frame.  This overriding purpose of the patent "well overtake[s]" the concrete elements and data gathering steps, rendering the patent's subject matter ineligible under § 101.

### C. Mayo, Diehr, and Flook

In another recent Supreme Court case, Mayo, where the court first applied the two-step analysis later used in Alice, Justice Breyer emphasized that the mere presence of an algorithm or law of nature does not render a patent ineligible.  The Supreme Court in Mayo reiterated that, "[w]hile a scientific truth, or the mathematical expression of it, is not a patentable invention, a novel and useful structure created with the aid of knowledge of scientific truth may be."  Mayo, 132 S. Ct. at 1294 (quoting Diamond v. Diehr, 450 U.S. 175, 188 (1981)).  In that vein, the Supreme Court in Diehr upheld as valid a patent claiming a process for curing synthetic rubber, reasoning that a mathematical formula alone is not patentable, but may be so when it is applied in a structure or process that is designed to be protected by the patent laws.  Diehr, 450 U.S. at 175-76.  However, the Court in Diehr also relied on the fact that the inventors did not "seek to pre-empt the use of that equation."  Id. at 176.  Instead, the claims were limited to a specific set of steps involving the installation of rubber in a press, closing the mold, constantly determining internal temperature, recalculating the cure time with a computer, and automatically opening the press at the proper time.  Id. at 187.

Unlike the limitations in Diehr, the claims here would virtually preempt the use of the navigation equation by others because the claims are overly broad in defining the system.  By claiming various generic inertial trackers and receivers for gathering orientation data, the inventors would preempt anyone who sought to use the equations because the only feasible way to gather orientation data from moving objects and reference frames would be from devices like the ones broadly described in the patent.  Thus, the claims here are potentially endless in their scope, and would not allow for others to use the mathematical equation at their core.  Indeed, the Supreme Court reasoned in Diehr that "[a] mathematical formula does not suddenly become patentable subject matter simply by having the applicant acquiesce to limiting the reach of the patent for the formula to a particular technological use. A mathematical formula in the abstract is nonstatutory subject matter regardless of whether the patent is intended to cover all uses of the formula or only limited uses."  Id.  at 192 n.14.

Further, the claims in Diehr involved a process that physically transformed synthetic rubber in a novel way.  While the Court notes that physical transformation is not required for § 101 eligibility, it does not find Plaintiff's system claim to be transformative of anything.  See Card Verification Solutions, LLC v. Citigroup Inc., No. 13 C 6339, 2014 WL 4922524, at *5 (N.D. Ill. Sept. 29, 2014) ("Therefore, even though the method does not result in the physical transformation of matter . . . it plausibly recites a patent-eligible application of the abstract idea of verifying a transaction.").  While the Plaintiff here claims that attaching an inertial tracker both to a moving

9

object and a moving reference frame is novel, its novelty does not approach the necessary inventiveness achieved by the claims in <u>Diehr</u>. "The questions of whether a particular invention meets the 'novelty' requirements of 35 U.S.C. § 102 or the 'nonobviousness' requirements of § 103 do not affect the determination of whether the invention falls into a category of subject matter that is eligible for patent protection under § 101." <u>Diehr</u>, 450 U.S. at 176. Thus, the novelty of attaching a generic inertial tracker to a moving reference frame is unpersuasive in the context of a § 101 analysis. Ultimately, the use of generic inertial trackers to measure an object's orientation is not inventive, and thus cannot serve to "transform" the abstract navigation equation into a patentable claim.

Furthermore, in <u>Diehr</u>, the claimed process was specifically limited and allowed for the curing of synthetic rubber in a new way. "Industrial processes such as this are the types which have historically been eligible to receive the protection of our patent laws." <u>Id.</u> at 184. Here, instead, the inventors have combined common measurement devices into a system to feed information into their navigation equation. While the Court is impressed by the equation's complexity, it is unconvinced that adding the requisite data-gathering elements to the patent claims moves the equation out of the abstract and into the specific. The Court is also concerned by the lack of limitations in the patent's claims, further contrasting this case from the claims in <u>Diehr</u>.

Instead, the claims at issue here are more akin to those rejected in <u>Parker v. Flook</u>, 437 U.S. 584 (1978). The claims in <u>Flook</u> involved a method for updating alarm limits during a catalytic conversion process. As the court noted again in <u>Diehr</u>, an alarm limit is "simply a number," and the claims in <u>Flook</u> merely sought to protect a formula for computing this number. <u>Diehr</u>, 450 U.S. at 186. Yet the claimed process in <u>Flook</u> did not disclose anything related to the chemical processes at work, the monitoring of the process variables, or the means of setting off an alarm or adjusting the alarm system. <u>Flook</u>, 437 U.S. at 586. Instead, the claims were directed to the mathematical formula itself. Similarly, here, the patent does not disclose the technical processes of inertial sensors gathering orientation data, nor does it claim to modify or improve the inertial sensors at work.

The Supreme Court also rejected in <u>Flook</u> the patentee's argument that adjustment of the alarm limit after employing the formula rendered the process distinct from the bare algorithm. In so holding, the Court explained, "[t]he notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance." <u>Id.</u> at 590. The Court identified the danger associated with allowing a "competent draftsman" to attach post-solution activity to a claimed formula and render it patentable. <u>Id.</u> The Federal Circuit has also rejected ad-hoc activities added to a formula with the intent of grounding an abstract patent claim. Specifically, "adding a data-gathering step to an algorithm is insufficient to convert that algorithm into a patent-eligible process." <u>In re Bilski</u>, 545 F.3d 943, 963 (Fed. Cir. 2008) (citing <u>In re Grams</u>, 888 F.2d 835, 840 (Fed. Cir. 1989)). The patentees here have done just that.

TVI's argument that "non-computer components, like inertial sensors," should not be considered generic is also unavailing. Pl.'s Opp. at 22. In addition to the inventors' own

10

description of inertial sensors as having "widespread acceptance" in the field of motion tracking and the fact that a range of sensors may fit the definition in the patent's claims, the Federal Circuit has found certain non-computer components to be generic and therefore ineligible. For example, in Cyberfone Sys., LLC v. CNN Interactive Grp., Inc., the patent at issue involved capturing and storing data with a telephone. 558 F. App'x 988, 990 (Fed. Cir. 2014). The patent claims required "obtaining data" from a telephone, "exploding" the data into its component parts, and sending the data to different destinations. Id. at 990-92. The patentee argued that the telephone was a "specific machine that plays an integral role in the method." Id. at 992. However, the Court rejected this logic, and noted that the claimed "telephone" could be a "range of different machines." Id. Indeed, the Court found that "[t]he 'telephone' recited in claim 1 is not a specific machine, and adds nothing of significance to the claimed abstract idea." Id. at 993. The Court finds that TVI's claimed system of inertial sensors is not materially more specific or unique than the generic telephone rejected in Cyberfone Sys., LLC.

D. Machine-or-Transformation Test

TVI also relies on SiRF Tech., Inc. v. Int'l Trade Comm'n, 601 F.3d 1319 (Fed. Cir. 2010) as an example of a "position-related claim[]" upheld under § 101 by the Federal Circuit. SiRF based its patent on the "machine-or-transformation test" outlined in Bilski, 561 U.S. at 605-06. Under that test, a claim satisfies § 101 if it (1) "is tied to a particular machine or apparatus," or (2) "transforms a particular article into a different state or thing." Id. at 602-04. To be "a meaningful limit on the scope of a claim," the machine "must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly." SiRF, 601 F.3d at 1333. Though previously considered the "sole test for deciding whether an invention is a patent-eligible 'process,'" the machine-or-transformation test has been relegated to a lesser role as an "investigative tool" that may provide "a useful and important clue" in determining patent eligibility. Bilski, 561 U.S. at 602-04. The Court will briefly examine this test here.

The Federal Circuit defines a machine as "a concrete thing, consisting of parts, or of certain devices and combination of devices. This includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result." SiRF, 601 F.3d at 1332 (citation omitted). In SiRF, the claims were directed to a method of calculating an absolute position of a GPS receiver and a method of "estimating a plurality of states associated with a satellite signal receiver" to assist in global positioning in low signal situations. Id. at 1331. The "GPS receiver" was held to be a "particular machine" that was "integral to each of the claims at issue." Id. at 1332. The Court focused on the fact that the "methods at issue could not be performed without the use of a GPS receiver," and there was no evidence that "the calculations [] can be performed entirely in the human mind." Id. at 1332-33. Yet Plaintiff's claims here are not tied to any particular machine that is integral to the claimed method of determining the relative orientation of two tracked objects.

Neither the "tracked object" nor the "moving reference frame" identified in the claims are particular machines, as neither has a limiting definition. Although Plaintiff points the Court

11

towards the patent's use in a fighter jet and pilot helmet, the claim language is not so limiting. Further, Plaintiff's inertial sensors are not a "particular machine," unlike the GPS receiver in SiRF. There, the claims were focused on improving GPS technology, and thus focused on the GPS receivers and the chips inside them. The claims were worded to reflect the integral nature of the GPS receiver, claiming a method comprising "estimating a plurality of states associated with a satellite signal receiver" and "forming a dynamic model relating the plurality of states, the dynamic model operative to compute position of the satellite signal receiver." Id. at 1331-32. The patent claims in that case were directed to improving the GPS device itself, and modifying the way GPS signal receivers could calculate location in poor signal reception conditions. Id. at 1322-23. Here, however, the inertial sensors can be a range of devices, including angular accelerometers, angular rate sensors, and angular position gyroscopes. '159 Patent at 1:63-67. The claims do not seek to improve upon inertial sensor technology and do not modify their capabilities; rather, the inertial sensors fill the role of gathering data to feed into the navigation equation and improve upon the field of motion tracking. Thus, the Court finds that Plaintiff's patent fails the first prong of the machine-or-transformation test because it is not tied to a particular machine, but merely incorporates a range of fungible machines in its data-gathering process.

The second prong of the machine-or-transformation test requires a process that "transforms a particular article into a different state or thing." Bilski, 561 U.S. at 600. Plaintiff argues that its claims are patent eligible because the "inputted data (forces measured by inertial sensors on the helmet and aircraft) are transformed into helmet-tracking information." Pl.'s Opp. at 24. Plaintiff claims this feature "fundamentally alter[s] the original . . . information." Card Verification Solutions, 2014 WL 4922524, at *5. However, as the Court noted in Card Verification Solutions, "[t]ypically, transforming data from one form to another does not qualify as the kind of transformation regarded as an important indicator of patent eligibility." Id. Further, Plaintiff's attempt to characterize the patent process as a "transformation of sensor data into helmet-orientation information" belies the scope of the patent's claims, which are not limited to a helmet's interface. Instead, the data is entered into a navigation equation and solved to provide the moving object's position and orientation relative to a moving reference frame. Although Plaintiff cites to Research Corp. Tech., Inc. v. Microsoft Corp., 627 F.3d 859, 869 (Fed. Cir. 2010) because it "[b]orrow[s] from the reasoning of the Supreme Court in Diehr" to explain that Diehr's transformation test applies to non-physical computer applications, the Court also notes that the patentees in Research Corp. did "not seek to patent a mathematical formula. Instead, they [sought] patent protection for a process of halftoning in computer applications." Research Corp., 627 F.3d at 869.

The Court finds that solving a mathematical equation incorporating Newtonian principles of motion does not "transform" sensor data into motion tracking information any more than Einstein's discovery of the natural law $E=mc^2$ transforms a mass measurement into energy information. Contrary to Plaintiff's characterizations, the data is not fed into one side of a machine and pushed out the other as something new. Instead, the tracking information is derived from mathematical calculations *based on* a combination of the sensor data and natural laws of motion. Plaintiff therefore fails the transformation prong of the machine-or-transformation test.

12

Conclusion

Ultimately, the concern that drives the exclusionary exceptions for abstract ideas and laws of nature from § 101 eligibility "[i]s one of pre-emption." Alice, 134 S. Ct. at 2354 (citation omitted). The Court finds that the scope of the subject patent's claims is insufficiently limited under the holdings of Mayo and Diehr, and if the patent were considered to protect eligible subject matter, it would pre-empt the use of the underlying abstract idea of relative motion tracking by others in the field. The patent's ineligibility is confirmed by the machine-or-transformation test, under which the claims are not tied to any specific machine and do not transform the nature of the patent into something more than the abstract mathematics behind it. At its core, the patent is seeking protection for the mathematical formulae used in determining the relative orientation of two moving objects. The Court is unwilling to afford patent protection to Plaintiff's claim on this building block of motion tracking technology.

Accordingly, Defendants' motion for judgment on the pleadings is GRANTED. The Clerk is directed to dismiss Plaintiff's complaint with prejudice.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge

13

# In the United States Court of Federal Claims

No. 14-513 C

**THALES VISIONIX, INC.**
  **Plaintiff**


 **v.**              **JUDGMENT**

**THE UNITED STATES**
    **Defendant**

  **and**

**ELBIT SYSTEMS OF
AMERICA, LLC**
    **Third-Party Defendant**


   Pursuant to the court's Opinion and Order, filed July 20, 2015, granting defendants' motion for judgment on the pleadings,

   IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed, with prejudice.


         Hazel C. Keahey
         Clerk of Court

**July 21, 2015**    By: s/ Debra L. Samler

         Deputy Clerk


NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

US006474159B1

## (12) United States Patent
### Foxlin et al.

(10) Patent No.: **US 6,474,159 B1**
(45) Date of Patent: **Nov. 5, 2002**

(54) **MOTION-TRACKING**

(75) Inventors: **Eric Foxlin**, Arlington, MA (US); **Yury Altshuler**, Chestnut Hill, MA (US)

(73) Assignee: **Intersense, Inc.**, Burlington, MA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/556,135**

(22) Filed: **Apr. 21, 2000**

(51) Int. Cl.$^7$ ............................................... **G01P 15/00**
(52) U.S. Cl. ....................................................... **73/488**
(58) Field of Search ............................... 73/488, 503.3, 73/504.03, 570, 514.01; 600/587, 595; 128/897, 898, 774, 782; 367/117, 118; 33/333, 355 R

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,645,077 | A | * | 7/1997 | Foxlin ........................ 128/774 |
| 6,176,837 | B1 | * | 1/2001 | Foxlin ........................ 600/595 |

#### OTHER PUBLICATIONS

E. Foxlin, "Head–tracking relative to a moving vehicle or simulator platform using differential inertial sensors", 2000.
E. Fuchs, "Inertial head–tracking", M.S. Thesis, Dept. of E.E.C.S., MIT, 1993.
E. Foxlin, "Inertial head–tracker sensor fusion by a complementary separate–bias kalman filter", Proc. VRAIS '96 Virtual Reality Annual Intl. Symposium, Santa Clara, CA 1996.
E. Foxlin et al., "Miniature 6–DOF inertial system for tracking HMDs", SPIE vol. 3362, Proc. AeroSense '98 Conference on Helmet– and Head–Mounted Displays III, Orlando, FL 1998.

InterSense Inc. homepage—http://www.isense.com.

K. Britting, "Inertial navigations systems analysis", New York, Wiley Interscience, 1971.

C. Broxmeyer, "Inertial navigation systems", New York, McGraw–Hill, 1964.

R. Parvin, "Inertial Navigation", Princeton, New Jersey, Van Nostrand, 1962.

R.G. Brown et al., "Introduction to random signals and applied Kalman filtering", 2nd edition, New York, John Wiley & Sons, 1992.

* cited by examiner

*Primary Examiner*—Helen Kwok
(74) *Attorney, Agent, or Firm*—Fish & Richardson P.C.

(57) **ABSTRACT**

Inertial trackers have been successfully applied to a wide range of head mounted display (HMD) applications including virtual environment training, VR gaming and even fixed-base vehicle simulation, in which they have gained widespread acceptance due to their superior resolution and low latency. Until now, inertial trackers have not been used in applications which require tracking motion relative to a moving platform, such as motion-base simulators, virtual environment trainers deployed on board ships, and live vehicular applications including helmet-mounted cueing systems and enhanced vision or situational awareness displays. to the invention enables the use of inertial head-tracking systems on-board moving platforms by computing the motion of a "tracking" Inertial Measurement Unit (IMU) mounted on the HMD relative to a "reference" IMU rigidly attached to the moving platform.

**42 Claims, 7 Drawing Sheets**



Case: 15-5150　　Document: 50　　Page: 95　　Filed: 03/02/2016



FIG. 1

Inertial meas. unit outputs $\omega_{nb}^b$ and $f_{nb}^b$

A0015



FIG. 2



FIG. 3A



FIG. 3B



FIG. 3C



FIG. 3D



FIG. 4



FIG. 5



FIG. 6

US 6,474,159 B1

**1**

## MOTION-TRACKING

### BACKGROUND OF INVENTION

This invention relates to motion-tracking.

Inertial tracking with automatic drift correction has been demonstrated to be a successful technique for tracking objects, such as limbs, cameras, input devices, or head mounted displays (HMDs), offering low jitter, fast response, increased range, and reduced problems due to interference or line-of-sight occlusion. Inertial trackers have been successfully applied to a wide range of HMD applications including virtual environment (VE) training, virtual prototyping, interactive visualization and design, VR gaming, and even fixed-base vehicle simulation. Within this gamut of applications, inertial trackers have gained widespread acceptance as a high-performance, robust and cost-effective alternatives to magnetic, optical and acoustic tracking systems. InterSense of Burlington, Mass., has pioneered the commercial development of motion tracking systems using miniature MEMS-based inertial sensors, and now offers a broad product line of inertial hybrid trackers.

Until now, inertial trackers have not been used in applications that require tracking motion relative to a moving platform instead of relative to the earth. This includes such important applications as motion-base driving and flight simulators, conventional VE systems deployed on board ships, and a range of live vehicular applications such as driver's or pilot's vision enhancement, helmet-mounted cueing systems, and advanced human-machine interfaces to improve pilots' situational awareness and control capability. People wishing to use inertial trackers in these types of applications have been realized that standard inertial tracking systems such as the InterSense IS-300, 600 or 900 will not function correctly if operated on a moving platform such as a motion-base simulator or vehicle. The inertial sensors would measure head motion relative to the ground, while the drift-correcting range sensors would measure head pose relative to the vehicle platform in which the reference receivers are mounted. While the vehicle is turning or accelerating, the Kalman filter would attempt to fuse inconsistent data and produce unpredictable results.

### SUMMARY OF INVENTION

The invention makes it possible to use inertial head-tracking systems on-board moving platforms by computing the motion of a "tracking" Inertial Measurement Unit (IMU) mounted on the object being tacked relative to a "reference" IMU rigidly attached to the moving platform. The advantages of the invention apply not only to inertial tracker with drift correction using ultrasonic ranging sensors, but also to hybrid inertial trackers involving optical, magnetic, or RF drift correction as well.

In general, in one aspect, the invention features a system for tracking the motion of an object relative to a moving reference frame. The system includes a first inertial sensor mounted on the tracked object; a second inertial sensor mounted on the moving reference frame; and an element coupled to the first and second inertial sensors and configured to determine an orientation of the object relative to the moving reference frame based on the signals from the first and second inertial sensors.

Implementations of the invention may include one or more of the following features. The first row and second inertial sensors may include three angular inertial sensors selected from the set of angular accelerometers, angular rate sensors, and angular position gyroscopes. The angular iner-

**2**

tial sensors may include angular rate sensors, and the orientation of the object relative to the moving reference frame may be determined by integrating a relative angular rate signal determined from the angular rate signals measured by the first and second inertial sensors. A non-inertial measuring subsystem may make independent measurements related to the orientation of the object relative to the moving reference frame, and use them for correcting any drift that may occur in the inertial orientation integration. The non-inertial measuring subsystem may be selected from the set of optical, acoustic, magnetic, RF, or electromagnetic technologies.

The determination of relative orientation may be done by computing the orientation of the object with respect to a fixed inertial reference frame using the signals from the first inertial sensor, the orientation of the moving reference frame with respect to the same fixed inertial reference frame using the signals from the second inertial sensor, and the relative orientation based on the two orientations.

A drift corrector may be used to correct inertial drift in the determined orientation of the object with respect to the inertial reference frame or of the moving reference frame with respect to the inertial reference frame. The drift corrector may include sensors for determining tilt with respect to earth's gravitational field, heading with respect to earth's magnetic field. A drift corrector may be used for correcting inertial drift in the determined orientation of the object with respect to the moving reference frame by using non-inertial sensors to independently measure the relative orientation.

The first and second inertial sensors may each include three linear accelerometers. An element may be included for calculating the position of the object relative to the moving reference frame. The calculating element may double-integrate a relative linear acceleration signal computed from the linear accelerometer signals measured by the first and second inertial sensors. The calculation of the relative linear acceleration signal may include compensation for tangential, Coriolis and centripetal acceleration effects caused by the angular velocity and angular acceleration of the moving reference frame. The compensation terms may be calculated using the angular velocity or angular acceleration of the moving reference frame measured by the second inertial sensor. In some implementations no compensation for the effect of gravity on the accelerometers is made.

The calculation of the position of the object relative to the moving reference frame may include computing the position of the object with respect to a fixed inertial reference frame using the signals from the first inertial sensor, the position of the moving reference frame with respect to the same fixed inertial reference frame using the signals from the second inertial sensor, and the relative position based on the two individual positions. A drift corrector may correct for inertial drift in the determined position of the object with respect to the inertial reference frame or of the moving reference frame with respect to the inertial reference frame. The drift corrector may include sensors for measuring position of both the object and the moving reference frame with respect to landmarks fixed in common inertial reference frame. The moving reference frame may be associated with a vehicle, and the second inertial sensor may include a pre-existing inertial measurement unit on a vehicle that was installed for the purpose of navigation. The first and second inertial sensors may each include at least six linear accelerometers and associated processors to extract three angular inertial signals and three linear accelerations.

Other advantages and features will become apparent from the following description and from the claims.

US 6,474,159 B1

| 3 | 4 |

## DESCRIPTION OF THE DRAWINGS

In the drawings:

FIG. **1** shows inertial tracking relative to stationary ground.

FIG. **2** shows inertial navigation relative to rotating earth.

FIG. **3**$a$ shows tracking a platform and head relative to ground, using inertial and ground-relative absolute sensors.

FIG. **3**$b$ shows tracking a platform relative to ground, and a had relative to ground (inertial) aided by platform-mounted sensors with known position relative to ground

FIG. **3**$c$ shows tracking a head relative to a platform, using a self-contained system.

FIG. **3**$d$ shows coordinate system conventions for the relative tracking system of FIG. **3**$c$.

FIG. **4** shows an IS-600 MPT configuration and block diagram.

FIG. **5** shows simulated tracking errors and 1-sigma covariance bounds for a 6-minute run.

FIG. **6** shows simulated IMU bias estimation errors and 1-sigma covariance bounds for a 6-minute run.

## DETAILED DESCRIPTION

1 Derivation of Kinematics

1.1 Inertial Tracking Relative to Fixed Platform

FIG. **1** illustrates the case of using an inertial system **100** to track the pose of a body b, with respect to an inertially fixed navigation frame, n. In this situation, which represents the operation of InterSense's existing tracking products, there are only two coordinate frames used. Hereafter, vectors and matrices are designated with boldface characters, and superscripts, if present, indicate in which frame vectors are coordinatized. The subscripts on $r_{nb}$ indicate that it is the vector from the n-frame origin to the b-frame origin. Likewise $\omega_{nb}^{b}$ represents the angular rate vector of the b-frame with respect to (w.r.t.) the n-frame coordinatized in the b-frame, which is what the strapped-down triad of rate gyros aligned with the b-frame axes measures. The accelerometer triad senses $f_{nb}^{b}$, the non-gravitational acceleration (also known as specific force) of the b-frame w.r.t. the inertial reference frame, n, expressed in b-frame.

The orientation of the b-frame w.r.t. the n-frame can be conveniently represented using a direction cosine matrix $C_b^n$, which is simply the 3×3 rotation matrix that transforms vectors from b-frame to n-frame: $v^n = C_b^n v^b$. The orientation is integrated, starting from a known initial orientation matrix, using the differential equation:

$$\dot{C}_b^n = C_b^n S(\omega_{nb}^b), \qquad (1)$$

where $S(\omega_{nb}^b) \equiv [\omega_{nb}^b \times]$ is the skew-symmetric matrix formed from the elements of $\omega_{nb}^b$ to implement the cross-product operator noted in the square brackets. The updated rotation matrix is then used to resolve the accelerometer readings into the n-frame, whence they can be easily corrected for the effect of gravity and double integrated to obtain the head position using:

$$\dot{v}_{nb}^n = C_b^n f_{nb}^b + g^n$$
$$\dot{r}_{nb}^n = v_{nb}^n \qquad (2)$$

where $g^n = [0\ 0\ 9.8\ \text{m/s}^2]^T$ is the local apparent gravity vector which by definition points downward in navigation (nav) frame, and the derivatives are both calculated relative to nav frame.

Equations (1) and (2) are integrated numerically in the InterSense IS-600 processor to keep track of orientation,

velocity and position. They may appear overly simple, but the gyro sensors in the InterSense InertiaCube™ IMU are not sensitive enough to detect the 15°/hr rotation of the earth, so there is no need to include terms to compensate for its effect on the sensors. The drift that results from using such low-performance gyros and neglecting the effects of earth rotation must be frequently corrected by other means, ultrasonic position sensors and a drift correction Extended Kalman Filter in the case of the IS-600.

1.2 Inertial Tracking Relative to Rotating Earth

In this section, we review the basic equations of terrestrial navigation, primarily as a source of inspiration for the derivation in the following section, which deals with a similar problem of tracking a moving body relative to another moving body.

Unlike the previous section, we will now need three coordinate frames. The inertial frame, or i-frame, has its origin at the center of the earth, but its axes do not rotate with the earth, rather they stay fixed with respect to the distant stars. The orbit of this frame about the sun is so slow that it is perfectly adequate to treat it as an inertial reference frame. Just as before, the body frame is defined fixed in the body being tracked, now an airplane, with the x-axis forward, y-axis right, and z-axis down. The navigation frame (n-frame) is now defined as a locally-level frame with its x,y,z-axes aligned to the local north, east and down directions respectively, as shown in FIG. **2**. The down direction is defined by the local apparent gravity vector $g_l$, the direction a plumb bob hangs, which is the resultant vector of the mass attraction vector towards the earth and the centrifugal acceleration vector away from the earth rotation axis felt by an object stationary on the ground.

In real-life terrestrial navigation, the n-frame follows the aircraft around, having its origin always at the current aircraft position. Therefore, position and velocity cannot be specified with respect to n-frame, and it is necessary to introduce yet another frame, called e-frame, with its axes fixed in the earth. The usual strategy for aircraft navigation is to calculate the "groundspeed" $v_e$ relative to the earth, but coordinatize it in n-frame. This is convenient because 1) it is much easier to compute local gravity in n-frame, and 2) the north, east, and down velocities can be directly integrated to keep track of position in terms of latitude, longitude and altitude, which are the desired coordinates for global navigation. However, for the present purposes, this adds some extra terms that are not needed for the derivation in the next section. For simplicity we will simply "freeze" the n-frame at a particular point on the earth, and assume that the plane flies around staying close enough to the origin of the n-frame that we can neglect curvature of the earth over this flying range.

We wish to track the airplane relative to the n-frame, which itself is moving relative to the inertial reference frame. The inertial measurement unit (IMU) on the airplane always measures the angular velocity and non-gravitational acceleration of the airplane relative to inertial space, expressed in b-frame: $\omega_{ib}^{b}$ and $f_{ib}^{b}$. Since $\omega_{ib} = \omega_{in} + \omega_{nb}$, we have

$$\omega_{nb}^{b} = \omega_{ib}^{b} - C_n^b \omega_{in}^{n}, \qquad (3)$$

which can be substituted into equation (1) and integrated to track the current orientation. $\omega_{ib}^{b}$ is available directly from the gyros, and $\omega_{in}^{n}$ can be calculated based on earth's rate and the latitude L. In the next section, where the n-frame is moving somewhat less predictably than the earth's rotation, $\omega_{in}^{n}$ cannot be calculated, but it can be directly measured by gyros mounted on the moving platform.

US 6,474,159 B1

**5**

To find the aircraft's velocity and position relative to the n-frame, which is rotating relative to the inertial frame, we need to make use of the Law of Coriolis, which can be stated in it's most general form as

$$D_a = D_b + \omega_{ab} \times \qquad (4)$$

where $D_a$ represents an operator that differentiates any vector w.r.t. the a-frame, and a and b are any two Cartesian coordinate frames that share a common origin but are rotating with a relative angular velocity $\omega_{ab}$. Start with the equations of motion in the inertial frame, which are exceptionally straightforward:

$$D_i^2 r_{ib} = f_{ib} + g_m \qquad (5)$$

This is a vector relationship, which will hold true in any coordinate frame, thus the lack of superscripts. $g_m$ represents a pure mass attraction gravity vector. We now wish to convert this n-frame. Expanding the left side of equation (5) with the Coriolis operator (4) we get:

$$
\begin{aligned}
D_i^2 r_{ib} &= \{D_i^2 r_{in}\} + \{D_i^2 r_{nb}\} \\
&= \{(D_n + \omega_{in} \times)^2 r_{in}\} + \{(D_n + \omega_{in} \times)^2 r_{nb}\} \\
&= \{(D_n + \omega_{in} \times)(D_n r_{in} + \omega_{in} \times r_{in})\} + \{(D_n + \omega_{in} \times)(D_n r_{nb} + \omega_{in} \times r_{nb})\} \\
&= \{(D_n \omega_{in} \times r_{in} + \omega_{in} \times D_n r_{in} + \omega_{in} \times (\omega_{in} \times r_{in})\} + \{D_n^2 r_{nb} + D_n \omega_{in} \times r_{nb} + \omega_{in} \times D_n r_{nb} + \omega_{in} \times D_n r_{nb} + \omega_{in} \times (\omega_{in} \times r_{nb})\} \\
&= D_n^2 r_{nb} + 2(\omega_{in} \times D_n r_{nb}) + \omega_{in} \times (\omega_{in} \times (r_{in} + r_{nb})) \\
&= \dot{v}_{nb} + 2(\omega_{in} \times v_{nb}) + \omega_{in} \times (\omega_{in} \times r_{ib})
\end{aligned}
$$

(6)

where terms containing $D_n \omega_{in}$ or $D_n r_{in}$ are dropped because $\omega_{in}$ and $r_{in}$ are constant vectors in the n-frame. Equating this to the right side of equation (5), we have

$$
\begin{aligned}
\dot{v}_{nb} &= f_{ib} + g_m - \omega_{in} \times (\omega_{in} \times r_{ib}) - 2(\omega_{in} \times v_{nb}) \qquad (7) \\
&= f_{ib} + g_l - 2(\omega_{in} \times v_{nb})
\end{aligned}
$$

where $g_l \equiv g_m - \omega_{in} \times (\omega_{in} \times r_{ib})$ is the local apparent gravity caused by both mass attraction and centrifugal acceleration acting on the body due to earth's rotation. Gathering the results in one place, the navigation equations are:

$$
\begin{aligned}
\dot{C}_b^n &= C_b^n S(\omega_{ib}^b - C_n^b \omega_{in}^n) \\
\dot{v}_{nb}^n &= C_b^n f_{ib}^b + g_l^n - 2(\omega_{in}^n \times v_{nb}^n) \\
\dot{r}_{nb}^n &= v_{nb}^n
\end{aligned}
\qquad (8)
$$

which may readily be integrated using the inputs $\omega_{ib}^b$ and $f_{ib}^b$ from the aircraft IMU, plus the quantity $\omega_{in}^n$ which is calculated from earth rotation rate and the known latitude of the n-frame origin. Comparing to equations (1) and (2), these differ only by the addition of some extra terms to compensate for the effect of the rotation rate of the n-frame, $\omega_{in}^n$, on the gyros and accelerometers. These extra terms are tiny or slowly varying compared to the original terms. It is therefore traditional to integrate these terms at a rate much lower than the numerical integration rate of the larger terms, which is typically several hundred Hz.

### 1.3 Inertial Tracking Relative to an Arbitrary Maneuvering Platform

We track a person's head relative to a maneuvering platform by borrowing the mathematics that an inertial navigation system uses to track an airplane relative to a rotating earth, as outlined in the previous section. Some modifications will be required because the platform motion is more dynamic and unpredictable than the earth's rotation:

**6**

1) We cannot simply calculate $\omega_{in}^n$ based on the known constant earth rotation and latitude. Instead, we will have to attach a reference IMU to the platform and use its gyros to measure $\omega_{in}^n$.
2) We cannot use the $D_n \omega_{in}$ or $D_n r_{in} = 0$ simplifications.
3) Unlike the earth, the platform may be accelerating as well as rotating, so we must add terms to the navigation equation based on the reference IMU accelerometer readings.
4) Platform motion cannot be assumed slow, so all the terms must be included in the m-rate integration algorithms.
5) The motion platform is maneuvering unpredictably, and is no longer a locally-level reference frame. The apparent gravity vector does not always point straight down in the platform frame.

In light of these complications, one approach would be to use a locally level n-frame attached to the ground, and use the ground-relative tracking algorithm of section 1.1 to track both the motion platform (p) and the user's head (h) relative to the ground (n). Then the user's head pose relative to the motion platform can be computed using $C_h^p = C_n^p C_h^n$ and $r_{p \rightarrow h}^p = C_n^p (r_{n \rightarrow h}^n - r_{n \rightarrow p}^n)$.

Several engineers familiar with the operation of the IS-600 have suggested this approach. However, in many practical situations, there is a problem. The IS-600 normal tracking algorithm described in section 1.1 requires a clear acoustical path between the tracked object and the receiver X-bar for making the drift-correcting range measurements. This is fine for open-top motion-base simulators that are sometimes used with HMD-based systems, as illustrated in FIG. 3a. However, many motion-base simulators have closed-top simulator cabs, which would effectively prevent the use of acoustic, optical, or magnetic devices for providing auxiliary measurements of the head position relative to a receiver unit mounted at a fixed location outside the simulator cab. A possible solution to this problem is illustrated in FIG. 3b. Here again, both the head and platform inertial systems track relative to the ground, using the algorithms of Section 1.1. For the platform-tracker, the drift-correcting range measurements are made relative to an external X-bar fixed in the environment, as usual. For the head-tracker, aiding measurements relative to the ground are required to correct the inertial measurements, but the X-bar visible to the head-tracker is mounted on the moving simulator platform. To create virtual measurements relative to the ground, we could use the known simulator platform pose to transform the positions of the X-bar receiver pods into the fixed reference frame before processing their range measurements. In some cases, the external X-bar could be eliminated by utilizing data from encoders on the motion base actuators if they were available and could offer millimeter precision in real-time.

This may be a viable approach for some simulators, but it won't work for tracking on moving vehicles, where millimeter-level vehicle position data is generally not available. In vehicular tracking applications (and most simulators

US 6,474,159 B1

7                                                                                                8

too), all that is required is the head pose relative to the moving platform. It would be desirable to find a method of measuring this pose directly, without having to track the vehicle with respect to the ground as well and to compute the pose difference afterwards. This would result in a general-purpose tracking system that would work with any type of moving platform, and the installation would be simpler because the whole system would be installed on the inside. FIG. 3c illustrates the hardware for such a system, installed in a motion-base simulator cab. In the remainder of this section, an approach is developed for doing this.

The first step to achieving the desirable tracking system illustrated in FIG. 3c is to choose the navigation frame fixed to the moving platform. FIG. 3d illustrates a particularly convenient choice of n-frame axes, centered at the reference IMU 300 and aligned with its axes. The reference IMU is bolted to the center of an IS-600 X-bar (or any other reference tracking device), which in turn is bolted to the canopy of the simulator cab or cockpit. This may seem somewhat strange to those accustomed to inertial navigation systems, where the n-frame is always a locally-level frame with its vertical axis aligned with the direction of local gravity. The main purpose of the n-frame in fact is to provide a digital equivalent to an old-fashioned mechanically-gimbaled inertial navigation system (INS), in which gyros on the gimbals are used to servo-stabilize an accelerometer triad into a level and north-slaved attitude, even as the vehicle maneuvers about. With the accelerometers always held in this North-East-Down orientation, one need merely add 1 g to the output of the z accelerometer, then double integrate the accelerometer outputs to track position in the nav frame. In strapdown systems, the stored $C_b{}^n$ matrix is used to transform the accelerometer readings into nav-frame, then do exactly the same thing, as described in equation (2). To use this technique with the dancing n-frame illustrated in FIG. 3d, it may seem necessary to constantly keep track of $C_n{}^l$ (just what we are trying to avoid doing) in order to figure out the effect of local gravity in the n-frame and compensate for it. However, in one aspect of the invention, we provide an alternative.

We can use the reference IMU to measure the gravitational field in the n-frame at every time step, instead of trying to calculate it? The key that makes this approach possible is the realization that it is not necessary to explicitly compensate for the effect of earth's gravitation on the b-frame accelerometers. It is the combined effect of gravity and acceleration of the n-frame that disturbs the b-frame accelerometers and must be removed before integration. It happens that this summed effect is exactly what the reference IMU accelerometers measure. Using this observation to our advantage, we now repeat the derivation of Section 1.2, but without the luxury of canceling any terms due to constancy of n-frame rotation. Starting again with the universal i-frame frame equation of motion (5), we proceed in similar manner to equation (6), except we don't expand the $D_i{}^2 r_{in}$ term:

$$D_i^2 r_{ib} = D_i^2 r_{in} + \{D_i^2 r_{nb}\} \qquad (9)$$

$$= D_i^2 r_{in} + \{(D_n + \omega_{in} \times)^2 r_{nb}\}$$

$$= D_i^2 r_{in} + \{(D_n + \omega_{in} \times)(D_n r_{nb} + \omega_{in} \times r_{nb})\}$$

$$= D_i^2 r_{in} + \{D_n^2 r_{nb} + D_n \omega_{in} \times r_{nb} + \omega_{in} \times D_n r_{nb} + \omega_{in} \times D_n r_{nb} + \omega_{in} \times (\omega_{in} \times r_{nb})\}$$

$$= D_i^2 r_{in} + \dot{v}_{nb} + \dot{\omega}_{in} \times r_{nb} + 2(\omega_{in} \times v_{nb}) + \omega_{in} \times (\omega_{in} \times r_{nb})$$

Using equation (5) to substitute both $D_i^2 r_{ib} = f_{ib} + g_m$ and $D_i^2 r_{in} = f_{in} + g_m$ and rearranging terms, we get

$$\dot{v}_{nb}{}^n = C_b{}^n f_{ib}{}^b - \dot{\omega}_{in}{}^n \times r_{nb}{}^n - 2(\omega_{in}{}^n \times v_{nb}{}^n) - \omega_{in}{}^n \times (\omega_{in}{}^n \times r_{nb}{}^n) - f_{in}{}^n \qquad (10)$$

where the orientation matrix $C_b{}^n$ comes from integrating

$$\dot{C}_b{}^n = C_b{}^n S(\omega_{ib}{}^b - C_n{}^b \omega_{in}{}^n) \qquad (11)$$

and position $r_{nb}{}^n$ is obtained by integrating

$$\dot{r}_{nb}{}^n = v_{nb}{}^n \qquad (12)$$

just as in Section 1.2.

If the reference IMU is mounted at the origin of the n-frame, then it directly measures $f_{in}{}^n$ and $\omega_{in}{}^n$, so (10) is the complete navigation equation, which can be integrated using just data available from the two IMUs. (A numerical approximation to the derivative of $\omega_{in}{}^n$ is needed if angular accelerometers are not available on the reference IMU.) The second, third and fourth terms are new additions compared to the stationary platform equation (2). They represent tangential, Coriolis, and centripetal accelerations respectively which result from the rotation of the n-frame. The Coriolis and centripetal terms are also present in the rotating earth navigation equation (8), with the latter also absorbed inside the definition of local gravity. The tangential acceleration term requires noise-boosting numerical differentiation of the discrete-time gyro outputs, and so could be a potential source of significant integration error if the lever arm $r_{nn}{}^n$ from the reference IMU 300 to the tracking IMU 310 is too long.

The fifth term, $-f_{in}{}^n$, replaces $g_n{}^n$, and incorporates both the effect of $g_m{}^l = [0\ 0\ g]^T$ rotated into the tilted n-frame as well as actual acceleration of the platform. By measuring the effect of gravity directly in the n-frame with a reference IMU, we do not need to know the platform tilt angles to resolve the gravity vector into the n-frame. Thus, this system operates independently without any inputs from the motion-base controller or the vehicle attitude reference system, and without the need to ever know or measure or calculate the orientation or position of the moving platform.

If the reference IMU is located at a non-zero offset position $r_{RIMU}{}^n$ from the n-frame origin, then it will measure

$$f_{in}{}^n = f_{in}{}^n + D_i^2 r_{RIMU}{}^n = f_{in}{}^n + \dot{\omega}_{in}{}^n \times r_{RIMU}{}^n / \omega_{in}{}^n \times (\omega_{in}{}^n \times r_{RIMU}{}^n)$$

Therefore, we must first remove the effects of tangential and centripetal acceleration from $\tilde{f}_{in}{}^n$:

$$f_{in}{}^n = f_{in}{}^n - \dot{\omega}_{in}{}^n \times r_{RIMU}{}^n - \omega_{in}{}^n \times (\omega_{in}{}^n \times r_{RISMU}{}^n)$$

then pass this true $f_{in}{}^n$ into the navigation equation (10). This may add additional computation and numerical errors, which could be avoided by defining the n-frame origin at the reference IMU (as shown in FIG. 3d) and then subtract $r_{RIMU}{}^n$ from the final computed result $r_{nb}{}^n$.

2 Simulation Results

2.1 IS-600 MPT Configuration Description

As an example of an implementation approach, we now define a specific tracking system configuration called IS-600 MPT. Referring to FIG. 4, the IS-600 MPT is a derivative of the InterSense IS-600 Mark 2 motion tracking system. Like the IS-600M2, the MPT has a reference X-bar 400 which holds four ultrasonic receiver pods 410, a tracking "station" 420 consisting of the tracking IMU 430 and two SoniDisc ultrasonic beacons 440 rigidly mounted on a strip about 6 inches long, and a rack-mount processor unit 450. The processor unit gathers the data from the various sensors,

US 6,474,159 B1

9

performs integration and sensor fusion algorithms, and outputs the cooked 6-DOF data to a host by serial port. The processor unit includes bias compensation units **465**, an orientation integration unit **470** for integrating the orientation values, a velocity integration unit **475** for integrating velocity values, a position integration unit **480** for integrating position values. All of these units receive correction values generated by the extended Kalman filter error estimator unit **485**. The values generated by these units are fed into the motion prediction unit **490**, which generates predicted motion values. In addition, the IS-600 MPT has an additional reference IMU **460** mounted at the center of the X-bar where the coordinate origin for the tracking reference frame (n-frame) is located. FIG. **4** illustrates the IS-600 MPT configuration as simulated in Section 2.3, including the enhanced kinematic integration algorithm derived in Section 1.3 for inertial tracking relative to a moving platform.

2.2 Bias Observability Problem

A careful examination of FIG. **4** reveals a potential problem with the proposed relative inertial tracking approach. One of the important tasks of the Extended Kalman Filter (EKF) error estimator is to estimate the inertial sensor biases, so that this information can be used to compensate the IMUs before performing the numerical integration of kinematics equations (11), (10), and (12). It is known that, for the case of fixed platform tracking using a single IMU, the complementary EKF formulation can successfully estimate and compensate for gyro biases. It is able to do this by indirectly observing the effect of the gyro biases on the propagation of orientation errors over time. Since a gyro bias on a particular gyro will cause orientation error to accumulate in a particular way, the filter can unequivocally trace back the orientation error to the offending gyro and correct its bias.

For the relative inertial tracking system of FIG. **4**, there are actually 6 gyros contributing to the integration of the 3-DOF orientation through equation (11). For any particular orientation of the b-frame relative to n-frame, any number of gyro bias combinations might result in the same orientation drift pattern. For example, when the relative yaw, pitch and roll between the platform and the head are all zero, $C_n{}^b = I^{3 \times 3}$, and $\omega_{nb}{}^b = \omega_{ib}{}^b - \omega_{in}{}^n$. Equal gyro biases on the x-gyros of both IMUs would therefore cause the n-frame and b-frame to both rotate in the same direction so that the relative orientation would not change. Therefore, these nonzero gyro biases would be unobservable by a state estimator (EKF) that only receives measurements of the relative orientation of the two frames. Due to space limitations, we will not calculate the observability Grammian to prove this, but rather accept it intuitively. A similar problem exists for accelerometer bias observability while the two frames are in any particular fixed pose relative to one another.

Fortunately, it also seems intuitively reasonable that the observability problem will disappear as long as the b-frame is moving relative to the n-frame. Consider starting at the [0 0 0] relative orientation holding steady. After a moment, the state estimator will not know any of the individual gyro biases specifically, but it will know that the difference between the two x gyro biases is a certain value. Now suppose the b-frame suddenly rotates to yaw angle 90° relative to the n-frame. Now the tracking x-gyro is paired with the reference y-gyro and vice versa and the x and y-gyro biases of both IMUs will become observable. After another rotation about a different axis, the z-gyros will become observable as well. Therefore, it would seem that the tracker should still work as long as the user occasionally moves her head.

10

Whether this is acceptable or not depends on how frequently she must move her head in order to keep the tracking system performing within specifications. If the tracker only starts to degrade noticeably in performance half an hour after the user stops moving completely, this is unlikely to be a problem for most real applications. In the next section, a simulation is developed and used to experiment with the effect of user motion or lack thereof on tracking quality.

2.3 Simulation Results

A simulation has been written to evaluate the performance of the proposed algorithm, and the seriousness of the bias observability problem just described. The inputs to the simulation are two "truth" trajectory files, one describing the motion of the platform ($C_n{}^i(t)$ and $r_{in}{}^i(t)$), and the other describing the motion of the head relative to the platform ($C_b{}^n(t)$ and $r_{nb}{}^n(t)$). The simulation performs the following steps:

1) Calculates the "truth" motion of the head relative to i-frame from the two input files.

2) Calculates ideal reference IMU outputs $f_{in}{}^n$ and $\omega_{in}{}^n$ from the platform trajectory.

3) Calculates the ideal tracking IMU outputs $f_{ib}{}^b$ and $\omega_{ib}{}^b$ from the i-frame head motion found in step 1.

4) Corrupts both IMU outputs with realistic levels of noise and bias error, representative of InertiaCube performance.

5) Feeds these simulated IMU outputs, as well as simulated range measurements (also corrupted with an appropriate level of noise) through the IS-600 MPT processor algorithms as depicted in FIG. **4**.

6) Plots the tracking system errors (the difference between the trajectory calculated by the simulated IS-600 MPT processor and the "truth" trajectory), together with the 1-sigma covariance bounds calculated by the EKF.

FIG. **5** shows the tracking system pose estimation errors (roll, pitch, yaw, x, y, and z errors) for a 6-minute run, simulated with a 30 Hz update rate. The platform trajectory had no motion. The head w.r.t. platform trajectory had a 30° yaw rotation (head shake) followed by a 30° pitch rotation (head nod) 10 seconds after the beginning of the simulation, and no motion thereafter. The tracking performance, approximately 0.2° rms in orientation and 1 mm rms in position, is only slightly degraded from an ordinary fixed platform IS-600 simulation with the same X-bar configuration and update rate. The interesting thing is that after the initial shake and nod, which were included to "get a fix" on the biases, the tracking continues for another 5½ minutes with no motion at all, and no noticeable increase in position or orientation errors.

FIG. **6** shows what happens to the bias estimation errors. As in FIG. **5**, the differences between the filter-estimated biases and the actual biases that were used to corrupt the ideal IMU outputs are plotted, together with the filter-calculated 1-sigma covariance bounds on the bias states. If you zoom in on the beginning section of the graphs, you can see that initially the bias covariances stay approximately where they were initially set, because they are not yet observable. After the yaw rotation, the x and y gyro biases for both IMUs rapidly come down to normal operating levels. After the pitch rotation, the z biases also come down, all as we would expect from the observability discussion in Section 2.2. Over the remaining 5½ minutes, we see the gyro bias error covariances gradually climbing back upwards due to lack of observability during the motionless period. Interestingly, the increasing bias errors do not seem to have any significant effect on the pose estimation errors over this

US 6,474,159 B1

**11**

time period. It also appears that the accelerometer biases do not increase noticeably.

Another simulation run was performed to see how long good-quality tracking can be sustained with no user head-motion. Again, the head-motion trajectory began with a 30° shake/nod to set the biases, but then was followed by a half-hour of stillness, this time sampled at 5 Hz to keep the file sizes manageable. The same pattern emerged. The gyro biases (but not accelerometer biases) gradually crept up from the level they had been set to after the initial wiggle. By the end of a half-hour they had reached 0.5°/s, but still with no noticeable increase in the pose estimation error covariances. At that point, the trajectory contained a second wiggle, but this time only 10° in amplitude. This small wiggle of the head was sufficient to send the biases back down to 0.3°/s. From this it seems likely that the tracking will work fine as long as the user wiggles his head by at least 10° at least every half-hour. There is little point tracking a person's head if he is dead, so we don't consider this a very limiting requirement. Additional simulation runs have been performed which included motion of the platform, to confirm that the kinematic algorithms really work to extract only the relative motion. Indeed it was found that the errors in the relative tracking of the head w.r.t. the platform only increase slightly when the platform is flying tight figure-8's. This confirms that the relative navigation equations derived in Section 1.3 are correct, and that the Kalman filter model developed around them is working.

We have described a new approach to head-tracking on moving vehicles or motion-base simulator platforms, based on differential inertial sensing. This approach allows the benefits of inertially-based motion tracking to be realized on moving platforms, without the head-tracking accuracy being disturbed by the unpredictable motions of the platform. One feature of the described method is that it is self-contained: the tracking system does not need to be provided with any external information about the platform motion, and it can be installed locally inside the volume being tracked, just like an ordinary fixed-base tracking system.

Although the results have been illustrated using an acoustic/inertial hybrid tracking system configuration based on the InterSense IS-600, the basic concept is equally applicable with any other type of aiding measurements for the inertial sensors, including the magnetic or optical tracking systems that are currently used in many cockpit helmet-tracking applications.

Other embodiments are also within the scope of the following claims.

What is claimed is:

1. A system for tracking the motion of an object relative to a moving reference frame, comprising:

a first inertial sensor mounted on the tracked object;

a second inertial sensor mounted on the moving reference frame; and

an element adapted to receive signals from said first and second inertial sensors and configured to determine an orientation of the object relative to the moving reference frame based on the signals received from the first and second inertial sensors.

2. The system of claim 1 in which the first and second inertial sensors each comprises three angular inertial sensors selected from the set of angular accelerometers, angular rate sensors, and angular position gyroscopes.

3. The system of claim 2, in which the angular inertial sensors comprise angular rate sensors, and the orientation of the object relative to the moving reference frame is determined by integrating a relative angular rate signal deter-

**12**

mined from the angular rate signals measured by the first and second inertial sensors.

4. The system of claim 3, further comprising a non-inertial measuring subsystem for making independent measurements related to the orientation of the object relative to the moving reference frame, and for using those measurements for correcting drift that may occur in the inertial orientation integration.

5. The system of claim 4, in which the non-inertial measuring subsystem is selected from the set of optical, acoustic, magnetic, RF, or electromagnetic technologies.

6. The system of claim 2, in which the determination of relative orientation includes

computing the orientation of the object with respect to a fixed inertial reference frame using the signals from the first inertial sensor,

computing the orientation of the moving reference frame with respect to the same fixed inertial reference frame using the signals from the second inertial sensor. and

computing the relative orientation based on the two orientations.

7. The system of claim 6, further comprising a drift corrector for correcting inertial drift in the determined orientation of the object with respect to the inertial reference frame or of the moving reference frame with respect to the inertial reference frame.

8. The system of claim 7, in which said drift corrector includes sensors for determining tilt with respect to earth's gravitational field.

9. The system of claim 7, where said drift corrector includes sensors for determining heading with respect to earth's magnetic field.

10. The system of claim 6, further comprising a drift corrector for correcting inertial drift in the determined orientation of the object with respect to the moving reference frame by using non-inertial sensors to independently measure the relative orientation.

11. The system of claim 2, in which the first and second inertial sensors each further comprises three linear accelerometers.

12. The system of claim 11, further comprising an element for calculating the position of the object relative to the moving reference frame.

13. The system of claim 12, in which the calculating element double-integrates a relative linear acceleration signal computed from the linear accelerometer signals measured by the first and second inertial sensors.

14. The system of claim 13, in which the moving reference frame has an angular velocity and an angular acceleration, and wherein calculation of said relative linear acceleration signal includes compensation for tangential, Coriolis and centripetal acceleration effects caused by the angular velocity and angular acceleration of the moving reference frame.

15. The system of claim 14, in which the compensation for tangential, Coriolis and centripetal acceleration effects is calculated using the angular velocity or angular acceleration of the moving reference frame measured by the second inertial sensor.

16. The system of claim 13, in which no compensation for the effect of gravity on the accelerometers is made.

17. The system of claim 12, in which the calculation of the position of the object relative to the moving reference frame includes:

computing the position of the object with respect to a fixed inertial reference frame using the signals from the first inertial sensor,

US 6,474,159 B1

13

computing the position of the moving reference frame with respect to the same fixed inertial reference frame using the signals from the second inertial sensor, and

computing the relative position based on the position of the object and the position of the moving reference frame.

**18**. The system of claim **17**, further comprising a drift corrector for correcting inertial drift in the determined position of the object with respect to the inertial reference frame or of the moving reference frame with respect to the inertial reference frame.

**19**. The system of claim **18**, in which the drift corrector includes sensors for measuring position of both the object and the moving reference frame with respect to landmarks fixed in common inertial reference frame.

**20**. The system of claim **1**, in which the moving reference frame is associated with a vehicle, and the second inertial sensor comprises a pre-existing inertial measurement unit on a vehicle that was installed for the purpose of navigation.

**21**. The system of claim **1**, in which the first and second inertial sensors each comprises at least six linear accelerometers and associated processors to extract three angular inertial signals and three linear accelerations.

**22**. A method comprising determining an orientation of an object relative to a moving reference frame based on signals from two inertial sensors mounted respectively on the object and on the moving reference frame.

**23**. The method of claim **22** in which the two inertial sensors each comprise three angular inertial sensors selected from the set of angular accelerometers, angular rate sensors, and angular position gyroscopes.

**24**. The method of claim **23**, in which the angular inertial sensors comprise angular rate sensors, and the orientation of the object relative to the moving reference frame is determined by integrating a relative angular rate signal determined from the angular rate signals measured by the first and second inertial sensors.

**25**. The method of claim **24**, further comprising making independent measurements with a non-inertial measuring subsystem related to the orientation of the object relative to the moving reference frame, and using those measurements for correcting drift that may occur in the relative orientation integration.

**26**. The method of claim **25**, in which the non-inertial measuring subsystem is selected from the set of optical, acoustic, magnetic, RF, or electromagnetic technologies.

**27**. The method of claim **24**, in which the determination of relative orientation includes

computing the orientation of the object with respect to a fixed inertial reference frame using the signals from the first inertial sensor,

computing the orientation of the moving reference frame with respect to the same fixed inertial reference frame using the signals from the second inertial sensor. and

computing the relative orientation based on the two orientations.

**28**. The method of claim **27**, further comprising using a drift corrector to correct inertial drift in the determined orientation of the object with respect to the inertial reference frame or of the moving reference frame with respect to the inertial reference frame.

**29**. The method of claim **28**, in which said drift corrector includes sensors for determining tilt with respect to earth's gravitational field.

14

**30**. The method of claim **28**, where said drift corrector includes sensors for determining heading with respect to earth's magnetic field.

**31**. The method of claim **27**, further comprising using a drift corrector to correct inertial drift in the determined orientation of the object with respect to the moving reference frame by using non-inertial sensors to independently measure the relative orientation.

**32**. The method of claim **23**, in which the first and second inertial sensors each further comprises three linear accelerometers.

**33**. The method of claim **32**, further comprising calculating the position of the object relative to the moving reference frame.

**34**. The method of claim **33**, in further comprising double-integrating a relative linear acceleration signal computed from the linear accelerometer signals measured by the first and second inertial sensors.

**35**. The method of claim **34**, in which the moving reference frame has an angular velocity and an angular acceleration, and wherein calculation of said relative linear acceleration signal includes compensation for tangential, Coriolis and centripetal acceleration effects caused by the angular velocity and angular acceleration of the moving reference frame.

**36**. The method of claim **35**, in which the compensation for tangential, Coriolis and centripetal acceleration effects is calculated using the angular velocity or angluar acceleration of the moving reference frame measured by the second inertial sensor.

**37**. The method of claim **34**, in which no compensation for the effect of gravity on the accelerometers is made.

**38**. The method of claim **33**, in which the calculation of the position of the object relative to the moving reference frame includes:

computing the position of the object with respect to a fixed inertial reference frame using the signals from the first inertial sensor,

computing the position of the moving reference frame with respect to the same fixed inertial reference frame using the signals from the second inertial sensor, and

computing the relative position based on the position of the object and the position of the moving reference frame.

**39**. The method of claim **38**, further comprising using a drift corrector to correct inertial drift in the determined position of the object with respect to the inertial reference frame or of the moving reference frame with respect to the inertial reference frame.

**40**. The method of claim **39**, in which the drift corrector includes sensors for measuring position of both the object and the moving reference frame with respect to landmarks fixed in common inertial reference frame.

**41**. The method of claim **22**, in which the moving reference frame is associated with a vehicle, and the second inertial sensor comprises a pre-existing inertial measurement unit on a vehicle that was installed for the purpose of navigation.

**42**. The method of claim **22**, in which the first and second inertial sensors each comprises at least six linear accelerometers and associated processors to extract three angular inertial signals and three linear accelerations.

\* \* \* \* \*